(No. 44370.—

THE PEOPLE *ex rel.* EDWARD V. HANRAHAN, State's Attorney, Appellant, v. EMIL CALIENDO *et al.,* Appellees.

*Opinion filed Dec. 17, 1971.—Rehearing denied Jan. 14, 1972.*

EDWARD V. HANRAHAN, State's Attorney, of Chicago, (VINCENT BENTIVENGA, Chief of Civil Division, and PAUL P. BIEBEL, JR., ARTHUR BELKIND and JAMES ROONEY, Assistant State's Attorneys, of counsel,) for appellant.

RICHARD L. CURRY, of Chicago, (SYDNEY R. DREBIN, of counsel,) for appellee.

MR. JUSTICE WARD delivered the opinion of the court:

The appeal here by the plaintiff, the State's Attorney of Cook County, followed the dismissal by the circuit court of Cook County of a *quo warranto* action which had been brought by the State's Attorney in challenge to the constitutionality of the Urban Transportation District Act, (Ill.Rev.Stat. 1969, ch. 111-2/3, pars. 501 through 518) and the creation under the Act of the Chicago Urban Transportation District, which we shall refer to as the District. The defendants in the action were the members of the Board of Trustees of the District: Emil Caliendo, Page W. T. Stodder, Alan S. Boyd, John H. Johnson and Arthur M. Wirtz. The circuit court, finding the statute constitutional and the creation of the District valid, sustained the defendants' motion to dismiss.

The Urban Transportation District Act became effective on July 31, 1969. Section 2 (par. 502), which declares

the public purposes underlying the Act, observes that there are many areas throughout the State with municipalities which contain outmoded transportation facilities; that the inadequacy of these transportation facilities impairs the vitality and welfare of the areas and municipalities in which they are located; that property values within these areas are consequently depressed; that economic, cultural and educational development is thwarted, and "that the unique and peculiar transportation needs and requirements of such areas, the derivation of maximum benefits by such areas from any improvements therein are found and determined to warrant the establishment of a separate agency of government with powers and duties relative to the development, improvement and other implementation of urban transportation requirements ***."

The Act provides that any municipality may establish a district within the municipality, if it is found that the "welfare and vitality of such area is *** jeopardized by the absence *** or other inadequacy of mass transportation facilities *** and that it is in the best interest of the area and the public that an Urban Transportation District be organized to exercise the powers and authorities prescribed by this Act, ***." (Par. 504.) A district "shall be a municipal corporation and shall constitute a body both corporate and politic separate and apart from any other municipal corporation or any other public or governmental agency." (Par. 511.) Before a district can operate, it is necessary that a majority of the voters within its proposed boundaries has voted in favor of its creation. Par. 505.

A district is to be governed by a Board of Trustees, consisting of five members. Two members are to be appointed by the Governor with the advice and consent of the Senate, and three by the mayor of the municipality with the consent of the municipality's governing body. Among its other powers, a district is authorized to issue bonds to obtain the funds necessary to finance proposed improvements. The principal amount of these bonds,

together with the other outstanding indebtedness of the district, shall never exceed five percent of the assessed valuation of all taxable property within the district. Too, at the time any bonds are issued, the district must levy "a general tax on all real and personal property situated in the district in an amount sufficient to pay the interest on such indebtedness as it falls due, and also to pay and discharge the principal thereof within twenty (20) years from the time of contracting said indebtedness."

Pursuant to the Act the city council of the city of Chicago on April 29, 1970, adopted a resolution designating an area within the city as an urban transportation district. In accordance with section 5 (par. 505) of the Act a petition was then filed with the circuit court of Cook County, requesting the court to order a special election at which the voters residing within the territory described in the resolution of the city council would vote on a proposition to create an urban transportation district from that area. An election was held on June 30, 1970, and the voters of the proposed district approved its establishment by a vote of 11,454 to 6,730.

The Board of Trustees has been appointed, and has adopted a plan to construct new rapid transit routes and systems at an estimated cost of $750,000,000. The Board hopes to obtain two thirds of the estimated cost from the Federal government, and has applied to the United States Department of Transportation for a $500,000,000 grant under the Urban Mass Transportation Act of 1964. (Public Law 91—453, 91st Congress, S. 3154, October 15, 1970, Abst. 25.) The District intends to obtain the balance of the funds through the issuance of bonds pursuant to section 13 (par. 513) of the Act. (Ill.Rev.Stat. 1969, ch. 111-2/3, par. 513.) The funds to satisfy these bonds will come from general taxes to be levied on the real and personal property situated in the district. This levy will be in an amount sufficient to pay the interest and retire the principal within 20 years from the issuance of the bonds. No bonds have as

yet been issued, nor have any taxes been levied. The District has, however, been advanced funds from other public agencies, including the city of Chicago, to make preliminary engineering studies and plans. In its application to the United States Department of Transportation, the District stated that it will enter into a lease under section 11 (par. 511) of the Act with the Chicago Transit Authority, the terms of which will obligate the Authority to operate and maintain the new facilities as an integral part of its metropolitan transportation system.

The plaintiff's contentions are that the United States constitution, the 1870 constitution of Illinois and the 1970 constitution of Illinois have been violated by the Act and by the creation of the district under the Act.

Preparatory to examining the specific contentions of unconstitutionality we would observe that we must examine the Act and the District's formation in the light of the constitution of Illinois of 1870 as well as the constitution of 1970. The Act was enacted and the District was formed when the 1870 constitution of Illinois was in force. In July 1971, the 1870 constitution was superseded by a new constitution, which had been approved by the voters on December 15, 1970. Though the majority of the Supreme Court of Michigan took a contrary position in a resembling situation (*City of Gaylord v. Beckett, 378 Mich. 273, 144 N.W.2d 460*) we do not consider that the adoption of a new constitution serves to validate all statutes enacted under the former constitution regardless of their legality or illegality under the earlier constitution. The issuance of bonds, the levy of taxes, and the construction of improvements will all be under the new constitution, but as the legislative origin of the Act and District was under the earlier constitution, we should consider the legality of that legislation under both constitutions.

We believe this conclusion is required by the transition schedule in the 1970 constitution of Illinois (section 9),

which schedule governs the passage to the later constitution. It provides in part: "The rights and duties of all public bodies shall remain as if this Constitution had not been adopted with the exception of such changes as are contained in this Constitution. All laws, ordinances, regulations and rules of court not contrary to, or inconsistent with, the provisions of this Constitution shall remain in force, until they shall expire by their own limitation or shall be altered or repealed pursuant to this Constitution." The District is a public body which purportedly had a constitutionally proper existence prior to the adoption of the constitution of 1970. Whether it was legally formed, we judge, depends on whether its formation was not inconsistent with the constitution of 1870. Thus, we are required to examine the legality of the "laws" under which the District was formed. This is consistent with the position this court took in 1875 in *People ex rel. Cairo and St. Louis R.R. Co. v. Trustees of Schools, 78 Ill. 136,* following the adoption of the constitution of 1870. There the court held a statute under which a school district sought to act unconstitutional under the constitution of 1848, though the attempted action by the district was subsequent to the adoption of the constitution of 1870.

The first challenge to constitutionality we consider is that certain property was included within the District for the sole purpose of deriving revenue for the contemplated transportation improvements. This, it is said, constitutes an arbitrary abuse of legislative discretion contrary to the due process clause of the Federal constitution and the due process clause of the 1870 Illinois constitution (article II, section 2) and presumably contrary to the due process clause of the constitution of 1970. No facts are set forth in support of the contention, but the plaintiff offers *Myles Salt Co. v. Board of Commissioners of Iberia and St. Mary Drainage Dist. (1916), 239 U.S. 478, 60 L.Ed. 392, 36 S.Ct. 204,* in argument. In *Myles* two parishes, pursuant to a Louisiana statute, established a

drainage district which included lands owned by Myles. The company refused to pay the tax involved and sued to restrain the attempted sale of its land, alleging that inclusion of its lands in the drainage district amounted to an arbitrary exercise of State legislative power.

The Supreme Court, considering the matter on appeal, said that while State legislatures have great latitude in settling the boundaries of special districts, the legislative discretion cannot consistently with the fourteenth amendment be exercised in an arbitrary fashion. The court observed in holding for Myles that its land had a maximum elevation of 175 feet, that the land for whose benefit the drainage district was organized had a maximum elevation of 15 feet and that it was impossible for any benefit to accrue to the *Myles* land from these drainage improvements. The court remarked: "It is to be remembered that a drainage district has the special purpose of the improvement of particular property, and when it is so formed to include property which is not and cannot be benefited directly or indirectly, including it only that it may pay for the benefit to other property, there is an abuse of power and an act of confiscation." 239 U.S., 478, 485, 60 L.Ed. 392, 396.

Thus, *Myles* declared that a State may not include property within a drainage district for the purpose of obtaining revenue for the special and sole benefit of other property, but that is not, as the defendants point out, what is concerned here. The District, they say, was not organized for "the improvement of particular property," but for the general public improvement of the District and its environs. Citing *St. Louis and Southwestern Railway Co. v. Nattin (1928), 277 U.S. 157,* and *Memphis and Charleston Railway Co. v. Pace (1931), 282 U.S. 241, 75 L.Ed. 315, 51 S.Ct. 108,* the defendants contend, and correctly, we consider, that general public improvements, to be paid for by general *ad valorem* property taxes, do

not impose upon the taxing authority any burden of showing special benefit. In *Nattin* the court said: "As the assailed tax was general and ad valorem, its legality does not depend upon the receipt of any special benefit by the taxpayer." (277 U.S. 157, 159.) And in *Memphis and Charleston Railway Co. v. Pact (1931), 282 U.S. 241, 246, 75 L.Ed. 315, 321,* the court found that the assessment challenged was valid under the principle that the validity of a general and ad valorem tax does not "\*\*\* depend upon the receipt of some special benefit as distinguished from the general benefit to the community."

We consider that the defendants correctly take the position that the legality of the District does not depend on whether the property within it will be specifically benefited, as it was created for the "general benefit of the community" within the meaning of *Memphis and Charleston Railway Co. v. Pace, 282 U.S. 241,* and *St. Louis and Southwestern Railway Co. v. Nattin, 277 U.S. 157.* This court has considered transportation improvements as creating general rather than local or special benefits. *City of Waukegan v. DeWolf, 258 Ill. 374; City of Chicago v. Law (1893), 144 Ill. 569; City of Chicago Heights v. Walls, 319 Ill. 411.*

Incidental to this argument the plaintiff says, without offering authority, that if the benefits flowing from the creation of the District are general, they are general to the entire metropolitan area of Chicago and that the constitutions (apparently, both State and Federal) would require the cost to be assessed against the entire area, rather than against the district only. The simple answer to this is that in many instances improvements made will incidentally benefit persons outside of the boundaries of the political body making the improvements. This would be particularly true in the case of improvements in transportation facilities, which would be obviously open to use by persons living beyond the taxing body's limits. There is no

requirment that all persons who might benefit from an improvement such as this must be assessed for its construction.

Claiming another violation of due process the plaintiff, citing *Browning v. Hooper (1926), 269 U.S. 396, 70 L.Ed. 330, 46 S.Ct. 141,* argues that due process entitles a property owner to notice and a hearing to determine whether his property will benefit from inclusion in the special district, and if so, to what extent. The District, however, was organized for a general public purpose; it is not a special assessment district designed for a local improvement, and, as we have observed, there is no necessity of showing any special benefit to a taxpayer. *Browning* is distinguishable on its facts from the situation we consider. There a Texas statute permitted "fifty resident property owning voters" to propose by petition to the County Commissioners the establishment of a road improvement district. If a petition was addressed to them, the county authorities were then to hold an election in the proposed district on the question of its creation, but the commissioners had no authority to change the boundaries described in the petition. Under this statute a road improvement district was created in Archer County, Texas. Several property owners claimed that the inclusion of their property in the district was improper because they had not been given notice and a hearing with regard to any benefit which would accrue to their property from the proposed road construction. After observing that the district had not been created by the legislature, but by private persons, the Supreme Court ruled that the failure to accord the objecting property owners such a hearing deprived them of due process. But the court explicitly limited its decision, stating: "Where a local improvement territory is selected, and the burden is spread by the legislature or by a municipality to which the State has granted full legislative powers over the subject, the owners of property in the district have no constitutional right to be heard on the

question of benefits. [Citations.] But it is essential to due process of law that such owners be given notice and opportunity to be heard on that question where, as here, the district was not created by the legislature, and there has been no legislative determination that their property will be benefited by the local improvement." *Browning v. Hooper, 269 U.S. 396, 405, 70 L.Ed. 330, 335, 46 S.Ct. 141.*

Unlike the situation in *Browning,* no delegation of legislative authority to private persons can be found in the Act or in the creation of the District. In section 4, (Ill.Rev.Stat. 1969, ch. 111-2/3, par. 504), the Act provides that the need for an urban transportation district and its boundaries are to be determined by a majority of the governing body of a municipality. That it is also necessary for a majority of the voters within the proposed district to approve the action of the governing body of the municipality does not make the district the product of private rather than legislative action. A resembling procedure in which a road district was created by county officers and approved by electors, was judged to constitute legislative action in *Memphis and Charleston Railway Co. v. Pace, 282 U.S. 241, 243-245, 75 L.Ed. 315, 319-320, 51 S.Ct. 108.*

The plaintiff also finds a violation of due process is the absence of a provision in the Act for the detachment of property which does not benefit from the formation and action of the district. But this contention is, of course, but a paraphrase of the untenable argument that property must benefit to be properly included within the district. A similar claim to a right of detachment was rejected by this court in *People ex rel. Honefenger v. Burris, 408 Ill. 68, 78-79.*

The plaintiff charges, too, that the Act violates the equal protection clause of the fourteenth amendment, because it allows the levy of taxes by appointed rather than elected corporate authorities, which he argues is

required by *Baker v. Carr (1962), 369 U.S. 186, 7 L.Ed.2d 663, 82 S.Ct. 691,* and *Avery v. Midland County (1968), 390 U.S. 474, 20 L.Ed.2d 45, 88 S.Ct. 1114.* But *Baker v. Carr* is to be read as requiring States to apportion congressional districts so that the vote of one man is substantially equal to the vote of another and *Avery* as extending this to other elections. Those decisions concerned the voter selection of governmental officials. As the Supreme Court observed in *Sailors v. Kent County Board of Education (1967), 387 U.S. 105, 18 L.Ed.2d 650, 87 S.Ct. 1549,* there is no requirement that appointments made by the States conform to the prescriptions of *Baker.* Too, in *Hadley v. Junior College District (1970), 397 U.S. 50, 58, 25 L.Ed.2d 45, 52, 90 S.Ct. 791,* it was said: "In holding that the guarantee of equal voting strength for each voter applies in all elections of governmental officials, we do not feel that the States will be inhibited in finding ways to insure that legitimate political goals of representation are achieved. \*\*\* We have \*\*\* held that where a State chooses to select members of an official body by appointment rather than election, and that choice does not itself offend the Constitution, the fact that each official does not 'represent' the same number of people does not deny *those people equal protection of the laws."*

Nor are we persuaded by a related contention that due process and equal protection under the basic doctrine of *Baker v. Carr, 369 U.S. 186, 7 L.Ed.2d 663, 82 S.Ct. 691,* require an election upon the issuance of bonds. As we noted in *In Re Contested Election, Natural Resources Development Bond Act, 47 Ill.2d 81, 87:* "At this juncture the Supreme Court of the United States has never extended the concept of 'one man—one vote' to decision-making elections but rather has specifically applied said concept to the election of persons by popular election to perform governmental functions." We held that *Baker v. Carr,* was not applicable to the referendum on the

"Natural Resources Development Bond Act" which was being challenged.

Nor do we find a violation of the due process provisions of the Illinois constitutions from the authority of appointed corporate officials to issue bonds without specific voter approval at a referendum. Properly appointed officials may issue bonds and levy taxes to pay for them. As this court recently said in *People ex rel. Vermilion County Conservation Dist. v. Lenover, 43 Ill.2d 209, 214:* "Our expression in *People ex rel. Adamowski v. Metropolitan Sanitary District, 14 Ill.2d 271,* is dispositive of the claim that a referendum is constitutionally required: 'The taxpayers are given constitutional control over the imposition of taxes by having a voice in the selection of, or the mode of selection of, the corporate authorities who impose taxes. \*\*\* However, there is no constitutional requirement that the issuance of bonds imposing a burden of taxation be submitted to the voters. \*\*\* The people of the [sanitary] district were not deprived of their property without due process of law by the failure of these amendatory acts to require submission of the question of issuance of bonds for establishing these working cash funds to the vote of the People.' [Citations.] " See also *Wilson v. Board of Trustees of the Sanitary Dist. of Chicago (1890), 133 Ill. 443.*

Another complaint of unconstitutionality is that the imposition of a tax on property within the district will constitute double taxation contrary to due process and in violation of the uniformity requirements of sections 9 and 10 of article IX of the 1870 constitution. The plaintiff does not specify how the property owners in the District will be subjected to nonuniform taxation, other than observing generally that both the city of Chicago and the District will tax the same property for similar purposes.

Uniformity of taxation is violated by double taxation, which this court has said "means taxing twice, for the same

purpose, in the same year, some of the property in the territory in which the tax is laid, without taxing all of it a second time." *(People ex rel. Toman v. Advance Heating Co. 376 Ill. 158, 163.)* Here it cannot be said that there would be taxation by both the city of Chicago and the District "for the same purpose." The public purposes of the Act have been described in the beginning of this opinion and it is clear that they relate specifically to outmoded and inadequate transportation facilities of municipalities and their consequences. There is no argument by the plaintiff that the city of Chicago taxes for an identical purpose. The simple fact that both the city of Chicago and the District may tax the same property does not violate the uniformity requirement. In *Kucharski v. White, 42 Ill.2d 335,* the Prospect Heights Library District taxed property within its boundaries for library purposes. After the property within the library district was annexed by the village of Arlington Heights, district property owners were required to pay a second tax for library purpose levied by the village of Arlington Heights. It was contended that such dual taxation deprived the taxpayers of due process and violated the uniformity provisions of sections 9 and 10 of article IX of the 1870 Illinois constitution. In rejecting this contention we said: "The fact that there are levies by different public authorities having practically similar powers exercised within parts of the same territory does not in and of itself constitute lack of uniformity in taxation." *Kucharski v. White, 42 Ill.2d 335, 337.*

We do not consider persuasive the plaintiff's contention that the Act allows the District to levy a tax for other than a proper corporate purpose contrary to section 9 of article IX of the 1870 Illinois constitution and the due process clauses of the State and Federal constitutions. In upholding the constitutionality of the Chicago Transit Authority we observed in *People v. Chicago Transit Authority, 392 Ill. 77, 86-89,* that the provisions of an

adequate transportation system in large metropolitan areas is a corporate purpose for which a municipal corporation such as the District may be vested with authority to levy and collect taxes.

There is no substance to the plaintiff's argument that the Act constitutes a local or special law within the prohibition of section 22 of article IV of the 1870 Illinois constitution. "The prohibition of section 22 of article IV of the constitution of the passage of local or special laws does not mean that a law to be considered general shall affect every person and every place in the State alike. It means simply that a law shall operate uniformly throughout the State in all localities and on all persons in like circumstances and conditions. [Citations.] " *(People ex rel. Conservation District v. Lenover, 43 Ill.2d 209, 217.)* By its terms the Act applies to all municipalities of this State "in which inadequate or outmoded public transportation facilities and/or services exist." Ill.Rev.Stat. 1969, ch. 111-2/3, par.502.

The final objection of plaintiff specifically under the 1870 constitution of Illinois is that the Act and District violate section 12 of article IX as providing a subterfuge to enable the city of Chicago to avoid that section's limitation on municipal indebtedness. It is true, of course, that the boundaries of the District are within the city of Chicago. However, as was pointed out in *Board of Education of the City of Chicago v. Upham, 357 Ill. 263, 267:* "Instances are numerous where the territory of one municipal corporation is superimposed on another. \*\*\* Each corporation may contract corporate indebtedness up to its constitutional limitation without reference to the indebtedness of any other corporation embraced wholly or in part within its territory. *(Highway Comrs. v. City of Bloomington, 253 Ill. 164.)*"

Plaintiff seeks to avoid the force of *Upham* by claiming that the District is not in truth a separate entity but is a sham or fiction created for the sole purpose of

financing facilities to be used by other entities. This is evidenced by the fact, he says, that the District has no authority to collect fees for the use of the facilities to be constructed, and that it plans to lease them to the Chicago Transit Authority. We do not find the arguments persuading. Section 11 of the Act gives the District express authority to operate its facilities or to lease them to any public agency. There is no prohibition against the District's receiving rents if it leases facilities, and the right to receive rents is, one must say, incident to the right to lease. Too, the District is not to be considered less than a separate and independent entity simply because it intends to lease facilities to the Chicago Transit Authority. This court has held that a municipal corporation may lease its property when empowered to do so by statute. *People ex rel. Adamowski v. R.R. Terminal Authority, 14 Ill.2d 230; People ex rel. Adamowski v. Public Building Com. of Chicago, 11 Ill.2d 125;* and *People v. City of Chicago, 349 Ill. 304.*

The plaintiff's concluding contention is that, even if the Act be deemed valid under the 1870 constitution, it is in conflict with section 9 of article IX of the 1970 constitution. Section 9(b) of article IX provides: "State debt for specific purposes may be incurred or the payment of State or other debt guaranteed in such amounts as may be provided either in a law passed by the vote of three-fifths of the members elected to each house of the General Assembly or in a law approved by a majority of the electors voting on the question at the next general election following passage. Any law providing for the incurring or guaranteeing of debt shall set forth the specific purposes and manner of repayment." The plaintiff says that the Act offends the new constitution because the debt which will be incurred by the District has not been approved by referendum or Act of the General Assembly.

The objection is not well founded. It cannot be said that there will be a "State debt" involved within the

meaning of section 9(a), article IX. The District is not, in the language of the section, a "public agency created by the State." It was created by the people residing within it.

Too, units of local government are expressly excluded from the operation of article IX by its section 9(a). We consider that the district is a unit of local government under section 1, article VII (Local Government) of the 1970 constitution, which in part provides: " 'Units of local government' means counties, municipalities, townships, special districts and units designated as units of local government by law, which exercise limited governmental powers or powers in respect to limited governmental subjects, but does not include school districts." Under the disposition we make it is unnecessary to consider whether the plaintiff's contention is barred by the transition schedule's provision that the rights of public bodies shall be unaffected by the new constitution except where a change in their rights and duties appears in the new constitution.

For the reasons given the judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*