EDNA RUTH ANDREWS *et al.*, Plaintiffs-Appellants, *v.* THE COUNTY OF MADISON, Defendant-Appellee.

Fifth District   No. 77-152

Opinion filed October 20, 1977.

Mateyka & Hill, of Granite City (M. Joseph Hill, of counsel), for appellants.

Harry E. Hartman, of Granite City, for appellee.

Mr. JUSTICE JONES delivered the opinion of the court:

Plaintiffs brought an action in the circuit court of Madison County to enjoin any and all acts of defendant Madison County in furtherance of its ordinance creating a special service area and providing for the financing of services to be rendered therein. This action was sought by the plaintiffs in their individual capacities and as representatives of a class comprised of all owners of real estate of record within the boundaries of the special service area. The court entered a detailed order denying plaintiffs' prayer for an injunction and thereafter denied plaintiffs' post-trial motion. Plaintiffs appeal to this court.

The controversy in this case involves the plan of Madison County to construct a sanitary sewerage system in an irregularly shaped but contiguous area within the county which incorporates portions of Nameoki, Chouteau and Venice townships. In the broadest sense, this

plan is objectionable to plaintiffs because the county attempts to accomplish it by creation of a special service area and the issuance of bonds to be retired by additional *ad valorem* taxes on properties within the specified area pursuant to "An Act to provide the manner of levying or imposing taxes for the provision of special services to areas within the boundaries of home rule units and non-home rule municipalities and counties" (hereinafter, Special Services Act) (Ill. Rev. Stat. 1975, ch. 120, par. 1301 *et seq.*)

The plaintiffs contend in this appeal: (1) Madison County, as a non-home-rule county, has no power to construct and maintain a sanitary sewerage system under article VII, section 7(6) of the Illinois Constitution of 1970 and its enabling legislation (Ill. Rev. Stat. 1975, ch. 120, par. 1301 *et seq.*); (2) the county could construct such a system pursuant to "An Act in relation to * * * sewage * * * in certain counties" (Ill. Rev. Stat. 1975, ch. 34, par. 3101 *et seq.*), but that the methods of financing are limited to those therein authorized; (3) taxes levied under the Special Services Act are in the nature of special assessments and therefore impermissible in this instance because of the lack of benefit accruing to certain properties in the area from the proposed sewer project; (4) the Special Services Act is unconstitutional in certain respects; and (5) the notice requirement of the Act was not satisfied by the county in this case.

On September 10, 1974, the Madison County Board by unanimous vote passed a resolution to establish a sewage system as authorized by "An Act in relation to * * * sewage * * * in certain counties" (Ill. Rev. Stat. 1973, ch. 34, par. 3101 *et seq.*). The resolution provided for financing in accordance with that act. (Ill. Rev. Stat. 1973, ch. 34, pars. 3117, 3121.) On April 21, 1976, the Board passed a resolution amending the resolution of September 10, 1974, to allow financing under the taxing scheme authorized by article VII of section 7(6) of the 1970 Illinois Constitution as elaborated in section 7 of the Special Services Act (Ill. Rev. Stat. 1975, ch. 120, par. 1307). At this same time, the Board also adopted an ordinance proposing the establishment of Special Service Area Number 1 for the purpose of providing a sanitary sewerage system therein.

The ordinance provided for a public hearing to be held on May 22, 1976, concerning the establishment of the area and the financing of the project and directed that notice be given, all in accordance with the requirements of the Act. (See Ill. Rev. Stat. 1975, ch. 120, pars. 1305—1307.) The ordinance further set out the form of the notice to be mailed and published which included all the information directed to be included in the notice under section 7 of the Act (Ill. Rev. Stat. 1975, ch. 120, par. 1307(1)—(4)). In addition, information was included concerning how the project could be blocked by petition as provided by the statute. (See Ill. Rev. Stat. 1975, ch. 120, par. 1309.) The proposed area was, as already

described, irregularly shaped but contiguous, and included portions of three townships.

On May 6, 1976, the proposed notice was published in the Granite City Press-Record, a newspaper of general circulation in Madison County. Also on May 6, identical notices, plus an attached map of the area, were mailed by the office of the county clerk of Madison County. The cost of the mailing at 13 cents per notice was $514.41, indicating the dispersement of 3957 notices.

The statute directs that the mail notices be "addressed to the person or persons in whose name the general taxes for the last preceding year were paid on each lot, block, tract or parcel of land lying within the special service area" and further provides that "[i]n the event taxes for the last preceding year were not paid, the notice shall be sent to the person last listed on the tax rolls prior to that year as the owner of said property." Ill. Rev. Stat. 1975, ch. 120, par. 1305.

Evelyn Bowles, county clerk, and Jo Ann Karl, an employee of the clerk's office, testified concerning the mailing of the notices. Their testimony revealed that heavy reliance was placed on the work of the attorney who represented the Board on this project in determining who should receive notices.

The attorney supplied the clerk's office with preaddressed envelopes directed to owners who had paid taxes on properties within the service area for the preceding year. These names were verified from the tax collector's books and others were added as appeared necessary. When the tax books indicated that a financial institution had paid the taxes on a particular property, an effort was made to determine who the owner was from previous tax records or records in the maps and plats department. If the owner was ascertained the notice was sent to him in care of the mortgagee institution. Ms. Karl testified that in many instances, notices had to be mailed to such an institution without any such cross-reference to the mortgagor. On redirect examination, Ms. Karl testified that many notices were sent out with more than one owner of record's name on the envelope. If several owners were listed as having the same address, for example, a husband and wife, only one notice was sent but the envelope would bear all of the names.

On May 22, 1976, the public hearing was held as planned. Many people expressed their support of the sewerage project. Likewise, many people expressed their objection to the project. The most frequent objection heard was to additional taxes levied against property in order to retire the $5,000,000 of general obligation bonds which would be issued to meet the county's share of the costs of constructing the sewerage system. After hearing all oral remarks and receiving all tendered written objections, the Board voted to proceed with the project and the hearing was adjourned.

The County Board on June 14, 1976, adopted an ordinance establishing Madison County Special Services Area Number 1 and providing for the financing of the sewerage project as already described. The ordinance was declared to be fully effective as of June 22, 1976, providing a sufficient petition of objection pursuant to section 9 of the Act (Ill. Rev. Stat. 1975, ch. 120, par. 1309) was not filed prior to such date.

Section 9 of the Special Services Act provided that:

"If a petition signed by at least 51% of the electors residing within the special service area and by at least 51% of the owners of record of the land included within the boundaries of the special service area is filed with the * * * county clerk, * * * within 30 days following the final adjournment of the public hearing objecting to the creation of the special service district, * * * [or] the levy or imposition of a tax or the issuance of bonds for the provision of special services to the area, * * * no such district may be created, * * * or no such bonds may be issued." (Ill. Rev. Stat. 1975, ch. 120, par. 1309.)

Within 30 days of the adjournment of the public hearing, petitions of electors and owners of record were filed in opposition to this project. The Board found them insufficient to block the project based on information supplied by the county clerk. This information was contained in a certificate of the clerk (Exhibit F to defendant's answer) which indicated that there were 7060 registered voters in the area, 1548 of which signed the electors' petition, and 6920 owners of record, 1710 of which signed the petition of owners.

At trial the clerk testified that she determined the number and names of electors or registered voters in the area from the voter's list. She utilized the precinct binders when the boundary of the area cut through a precinct. She further related that she arrived at the number and names of owners of record by a procedure which involved the maps and plats department of the county. The clerk took a map of the service area to the department. In turn, it was compared against the tax maps and a list of all parcels of land and their owners was compiled. The names on the elector and owner petitions were then compared with these lists. After duplicate and invalid signatures were discounted, the figures appearing on the certificate were derived. Subsequent to the Board's finding the petitions to be insufficient, the plaintiffs brought this suit.

At the trial plaintiffs endeavored to bring out evidence which reflected poorly on the benefit to those in the area to be derived from the sewerage project. On cross-examination of Edward Juneau, the engineer for the project, the witness conceded that Special Service Area 1 includes rather large tracts of unoccupied and unimproved farm land. Evidence was adduced that there are two areas in the district which presently are

serviced by lagoon type sewage systems. One of these lagoons services numerous apartment buildings owned by plaintiff George Dyckman. Mr. Dyckman's testimony showed that he received no notice of the hearing or project pursuant to his ownership of these buildings, his co-ownership with his wife of their home or by means of publication.

Defendant's witness Louis Whitsell at the time of trial was supervisor of Nameoki township and the chairman of the township's Board of Health. He was also a Madison County Board member and a member of the Madison County Sanitary Sewer Committee. Mr. Whitsell testified concerning the sewage problems which had come to his attention during his five year tenure as chairman of the Board of Health. He testified that in 1975 the Health Board received 217 complaints of health violations, at least 30 of which related to septic tanks. He further related that there was an overflow problem with one of the existing lagoon systems previously mentioned and that the other lagoon was troublesome because its sandy soil made it very difficult to retain sufficient water to cover the sewage.

On cross-examination, Mr. Whitsell was questioned about an area of Nameoki township that abuts the city of Granite City along Pine Street. In prior testimony of engineer Juneau it was determined that some of the houses on Pine Street were within the corporate limits of Granite City and some were not and that the boundary of the special service area was drawn so as to include only those properties outside the corporate limits. Mr. Whitsell now admitted that five or six houses which were outside the city limits and within the service area as drawn were connected to the city's sewer system. He agreed that since there was no detachment procedure under the Act or the county's ordinance, the owners of those houses would be taxed for the construction of the sanitary sewerage system although they already have sewer services available.

We first consider the questions whether a non-home-rule county such as Madison County is empowered to construct a sewerage system in a limited area comprising less than the whole county under section 7(6) of article VII of the Illinois Constitution of 1970 and the Special Services Act (Ill. Rev. Stat. 1975, ch. 120, par. 1301 *et seq.*), and whether a county's power to construct a sewerage system under "An Act in relation to * * * sewage * * *" (Ill. Rev. Stat. 1975, ch. 34, par. 3101 *et seq.*) must be viewed as limited to the financing methods set out in that Act.

The plaintiffs argue that the special services tax provision of the constitution only gave non-home-rule counties the authority to tax different areas at different rates, that the provision did not furnish these counties with any powers other than those specifically given to them by the General Assembly. They further argue that the only statutory authority for a county's construction of a sanitary sewerage system is found in section 11 of "An Act in relation to * * * sewage * * *" (Ill.

Rev. Stat. 1975, ch. 34, par. 3111) which states that a county may construct and operate a sewerage system "as provided in this Act." It is plaintiffs' belief that this phrase dictates that only those finance methods enumerated in that Act may be utilized, to the exclusion of financing under the Special Services Act.

No court in Illinois has ever considered what activities are properly financed by a special service area tax in a non-home rule county. However, Attorney General William J. Scott has considered this question in one of his opinions. (1975 Op. Att'y Gen. 197.) The Attorney General examined the definition of special services found in section 2 of the Special Services Act (Ill. Rev. Stat. 1975, ch. 120, par. 1302) which reads as follows:

> " 'Special Services' means all forms of services pertaining to the government and affairs of the municipality or county, including but not limited to improvements permissible under Article 9 of the Illinois Municipal Code."

He was of the opinion that this sentence should be construed so as to allow non-home-rule units to use the tax only to support the exercise of their express statutory powers. In this estimation, any broader construction would run afoul of the manner in which the constitution distributes power to home rule units vis-a-vis non-home-rule units, as well as the manner by which a non-home-rule unit may become a home rule unit (Ill. Const. 1970, art. VII, §6(a)), since a broad construction would delegate home-rule powers to non-home-rule counties and municipalities. Our examination of the history of the special service area taxation power in the constitutional convention as well as the express terms of this section leads us to a different conclusion.

Before commenting further, we note that even under the interpretation of the Attorney General, Madison County is empowered to create a special service area and to provide for a sewerage project therein in accordance with the Special Services Act's financing scheme in furtherance of its authority to construct a sewerage system pursuant to section 11 of "An Act in relation to * * * sewage * * * in certain counties" (Ill. Rev. Stat. 1975, ch. 34, par. 3111).

■■ The Attorney General in his opinion advised the State's Attorney of Wabash County that the county, although a non-home-rule unit, could finance an ambulance service by means of a special service tax levied in a contiguous area within the boundaries of the county. He noted that section 25.12—1 of "An Act to revise the law in relation to counties" (Ill. Rev. Stat. 1973, ch. 34, par. 419.1) authorizes counties to provide emergency ambulance service. Although that section states that the expenses incurred in providing such service can be collected from general

funds of the county or from the proceeds of a tax levied under the provision of another section of the Act (Ill. Rev. Stat. 1973, ch. 34, par. 409.9), he was of the opinion that the county had the alternative to finance under the Special Services Act if all other requirements of that act were met. We believe the same is undoubtedly true with respect to the provision of a sanitary sewerage system within a contiguous area of a county. Even though section 11 (Ill. Rev. Stat. 1975, ch. 34, par. 3111) contains the phrase "as provided in this Act," we do not believe that its inclusion in this statute in 1961 was intended to have or should have any limiting effect on alternative finance powers given to counties in 1973 to assist them in combatting local problems. The mere fact that an act sets out a means by which to meet the costs of acting under it does not indicate an intent to prevent the legislature from creating other means of financing in the future, especially for projects benefitting an area smaller than the whole governmental unit. We therefore find that the methods for financing a sewerage system under "An act in relation to * * * sewage * * *" (Ill. Rev. Stat. 1975, ch. 34, par. 3101 *et seq.*) are not limited solely to those provided in that Act and that Madison County could properly provide a sewerage system under that statute yet pay for its construction and maintenance under the Special Services Act.

Our prime objective in determining whether a non-home-rule county is empowered to provide and pay for a sanitary sewerage system under the Special Services Act alone and whether its powers are more limited with respect to special services than home rule units is to ascertain and effect the intentions of the framers of the constitution and the legislature. *Chicago Transit Authority v. Danaher*, 40 Ill. App. 3d 913, 353 N.E.2d 97; *People v. Bratcher*, 63 Ill. 2d 534, 349 N.E.2d 31.

Section 7 of article VII of the constitution reads in pertinent part:

"*Counties* and municipalities *which are not home rule units* shall have only powers granted to them by law *and* the powers * * * (6) to levy or impose additional taxes upon areas within their boundaries in the manner provided by law for the provision of special services to those areas and for the payment of debt incurred in order to provide those special services." (Emphasis added.)

In contrast, the section dealing with home rule units, section 6 of article VII provides in pertinent part:

"(a) A County which has a chief executive officer elected by the electors of the county * * * [is a] home rule [unit]. * * * Except as limited by this Section, a home rule unit may exercise any power and perform any function pertaining to its government and affairs including, but not limited to, the power to regulate for the

protection of the public health, safety, morals and welfare; to license; to tax; and to incur debt.

\* \* \*

(1) The General Assembly may not deny or limit the power of home rule units \* \* \* (2) to levy or impose additional taxes upon areas within their boundaries in the manner provided by law for the provision of special services to those areas and for the payment of debt incurred in order to provide those special services."

As is apparent from a comparison of the language of the above sections granting the power of special service area taxation to both home rule and non-home-rule counties, the provisions are practically identical. The only difference is that the framers clearly indicated that the legislature could not deny or limit the power of home rule units in this regard. The absence of such a limitation to section 7(6) would seem to indicate by implication that the legislature could limit the power of a non-home-rule county to provide special services and to impose additional taxes for their provision. However, examination of the debates of the constitutional convention reveals that section 6(1)(2) was intended to give home rule units identical powers with respect to special services taxation as section 7(6) gives to non-home-rule units. (See 5 Record of Proceedings, Sixth Illinois Constitutional Convention 4449 (Vice Chairman Carey's remarks).) In any event, the Special Services Act, which was passed after our supreme court held in *Oak Park Federal Savings & Loan Assoc. v. Village of Oak Park* (1973), 54 Ill. 2d 200, 296 N.E.2d 344, that the constitutional provision (art. VII, §6(1)(2)) was not self-executing but needed enabling legislation, did not expressly limit the power of non-home-rule units and appears on its face to apply equally to both types of counties. Its definition of "special services" in section 2 (Ill. Rev. Stat. 1975, ch. 120, par. 1302), set out above, is very broad; any form of services pertaining to the government or affairs of the county including improvements permissible under article 9 of the Illinois Municipal Code (Ill. Rev. Stat. 1975, ch. 24, par. 9—1—1 *et seq.*) is allowed. Since it has long been held that sewerage systems are local improvements authorized under precursors of our Municipal Code (*e.g., Payne v. Village of South Springfield*, 161 Ill. 285, 44 N.E. 105; *Fisher v. City of Chicago*, 213 Ill. 268, 72 N.E. 680; *City of Belleville v. Miller*, 339 Ill. 360, 171 N.E. 535), we believe that the provision of sewers is a service approved by the Act. Moreover, remarks made during the constitutional debates strongly indicate that construction of sanitary sewers was considered by the delegates to be one type of special services which they were authorizing by enactment of the constitutional provisions. 4 Record of Proceedings 3146 (Delegates R. Johnsen and Mullen).

■■ Our examination of the debates at the convention and the history of the special service area taxation provision as it proceeded to its final form convinces us that the intent of the framers of the constitution was to provide identical, broad powers with respect to the provision of such services to both types of counties and that the definition of special services in section 2 of the Act need not be construed contrary to its express language.

The original proposal, section 4.2 (7 Record of Proceedings 1662), obviously applied to both home rule and non-home-rule counties since it spoke of giving *units of "local general government"* (*see* Ill. Const. 1970, art. VII, §1) the power to "levy or impose taxes differentially * * * for the performance of special services and for the payment of debt." When this section was discussed by the delegates (see 4 Record of Proceedings 3145-3148), it was apparent that the provision was intended to apply to any county, city, village or incorporated town. There was no indication whatsoever that fewer types of services could be provided by non-home-rule units. Although the concept embodied in the proposal was unanimously approved, the word "differential" was rejected as not articulating the scope with clarity.

When this provision was next submitted to the delegates, it had been split into two sections, section 6(e)(3) of article VII, dealing with home rule units and section 7(6), dealing with non-home-rule units. (See 7 Record of Proceedings 2474-77.) The grant to non-home-rule units was in the form of the present constitutional provision; however, it was quickly pointed out that section 6(e)(3) improperly stated that home rule units would only have powers to levy taxes for special services as granted by the legislature and an amendment was directed to be prepared. 5 Record of Proceedings 4248-49.

When this final amendment (the current section 6(1)(2)) was approved Delegate Carey, vice chairman of the Committee on Local Government, made clear that under the previous proposals they had given the constitutional right of special area taxing privileges to non-home-rule units but had in effect failed to give the same unbridled right to home rule units. The effect of the final amendment was then to give these units the same power already granted to non-home-rule units. 5 Record of Proceedings 4449.

Faced with this history, we believe it is an inescapable conclusion that the intent of the constitution's framers was to give all units of general local government the same broad powers to meet the myriad problems presented in local areas, especially unincorporated areas. The legislature's definition of special services is appropriately open ended and without reservation as to non-home-rule units. Accordingly, we find that Madison County is authorized by the constitution and the Special Services Act to

construct a sewerage system and finance it under that Act, independent of any power under section 11 of "An Act in relation to * * * sewage * * * in certain counties" (Ill. Rev. Stat. 1975, ch. 34, par. 3111).

The plaintiffs next contend that the tax to be imposed on properties within this special service area is in the nature of a special assessment and that it would therefore be improper to levy it without showing special benefit to each property taxed. They argue in support of this contention that this project is limited to a specific locale and intended basically to benefit that area. They point to the large areas of unimproved properties and those properties with hook-ups to the Granite City sewers as areas which are not properly benefitted and argue summarily that these properties were included only for the revenue they would provide for the benefit of other properties in violation of due process under the rule of *Myles Salt Co. v. Board of Commissioners* (1916), 239 U.S. 478, 60 L. Ed. 392, 36 S. Ct. 204.

There is no doubt but that there are similarities between this special services process and that of special assessments for local improvements. It is also true that the imposition of general *ad valorem* property taxes resembles the method used for providing general public improvements without the burden of showing special benefit. (See generally *People ex rel. Hanrahan v. Caliendo*, 50 Ill. 2d 72, 277 N.E.2d 319, *appeal dismissed* (1972), 406 U.S. 965, 32 L. Ed. 2d 663, 92 S. Ct. 2412.) As the plaintiffs admit, though, special services area taxation is something of a hybrid.

■■■ Nevertheless, we believe that the intent of the framers of the constitution in enacting article VII, sections 7(6) and 6(1)(2) was to provide a procedure for making improvements which was distinct from the special assessment procedure and which avoided the complexities of special assessments, including the procedure of determining and debating the relative benefits to be supplied to each piece of property.

First, we note that the constitution gives both home rule and non-home-rule counties and municipalities the power to make local improvements by special assessment *in addition* to the power to provide special services by additional taxes. (Ill. Const. 1970, art. VII, §§6(l)(1) and 7(1).) This in itself demonstrates that these procedures were considered to be distinct. Moreover, the remarks of Delegate Karns, chairman of the Committee on Revenue and Finance, during the debates on the first version of the proposal which became section 7(6) and 6(1)(2) of article VII of the constitution clearly reflects that not only is the procedure to be distinct but also less complicated and involved.

"MR. KARNS: * * * I feel personally that this [proposed section 4.2] is a great improvement over building or creating local improvements by special assessment. It has all the advantages of, I think, simplicity, as compared with the complexities of special

assessments that Mr. Lennon just discussed [4 Record of Proceeding 3143—44]. I can see this used to a great extent, particularly, as Mrs. Mullen indicated, in the unincorporated areas of counties—building streets, sidewalks, a variety of things." (4 Record of Proceedings 3146—47.)

As this court has recently said in *Hiken Furniture Co. v. City of Belleville*, 53 Ill. App. 3d 306, 310, 368 N.E.2d 361, "It seems clear that the burden of taxation was to be born by the property benefitted by the special service and that the initial determination of benefit must of necessity be made by the governmental entity involved." The governmental unit is entrusted under the constitution and statute to determine what properties will be benefitted by the service to be provided. The additional taxes may be levied against those properties without resorting to the meticulous methods of assessing the value of benefits to each property followed in special assessment cases.

■■ We do not believe that the county abused its power in setting the area's boundaries as did the police juries in the *Myles Salt* case. There is a complete lack of proof that the county included the areas of unimproved farm land and the several lots with city sewer service in the special service area in order to gain revenue with which to improve others' properties. There is however, some hardship worked on the owners of the five or six houses on Pine Street which already have sewer service provided by Granite City.

Since there is no detachment procedure provided in the Special Services Act or County Ordinance of June 14, or apparently contemplated by the constitution, these owners will be taxed to help defray the costs of this sewerage system even though they are already connected to sewer lines. This situation is unfortunate but irremediable by this court. We presume that those property owners are paying a user's fee for their present service rather than a tax. There is no evidence to the contrary in the record. They are not then threatened with double taxation but with a situation where their best option is to disconnect from the city sewers and to run a line to the collection lines of the new sewerage system as the others in the area will do. The framers of the constitution by not placing any emphasis on withdrawal from the area on the basis of double service have indicated an intention that this type of detachment problem be left to the legislative and political process.

■■ Plaintiffs next contend that section 9 of the Special Services Act (Ill. Rev. Stat. 1975, ch. 120, par. 1309) is unconstitutional. That section is quoted above in our recitation of the facts. It basically provides that a special services project is defeated if a petition of at least 51% of both owners of record and electors within the service area is filed within 30 days of the adjournment of the public hearing. Their argument is difficult

to understand. We do glean that they believe the burden placed on objectors to defeat a proposed service area is an onerous one, one they describe as equivalent to "trying to get 75% of voters to approve something by referendum." That a section's requirements are difficult to meet, however, is not sufficient grounds to make the section unconstitutional.

Although recognizing that a referendum on the issuance of bonds imposing a burden of taxation is not constitutionally required (*People ex rel. Vermilion County Conservation District v. Lenover*, 43 Ill. 2d 209, 214-15, 251 N.E.2d 175; *People ex rel. Hanrahan v. Caliendo*, 50 Ill. 2d 72, 83, 277 N.E.2d 319, *appeal dismissed* (1972), 406 U.S. 965, 32 L. Ed. 663, 92 S. Ct. 2412), the plaintiffs argue that section 9 is a "back door referendum" which attempts to avoid the constitutional requirement that a simple majority is sufficient to pass a referendum and that elections be "free and equal." We fail to perceive any merit whatsoever in this assertion. This section is not constitutionally infirm.

The last issues raised by plaintiffs concern the notice to be given prior to the public hearing. In addition to requiring that notice be published in a newspaper of general circulation within the county at least once not less than 15 days prior to the hearing, section 5 of the Act (Ill. Rev. Stat. 1975, ch. 120, par. 1305) provides, as already noted, that notice be mailed "to the person or persons in whose name the general taxes for the last preceding year were paid on each lot, * * * within the special service area." In the event taxes were not paid the preceding year, the section directs that the notice be sent "to the person last listed on the tax rolls prior to that year as the owner of said property." Plaintiffs argue that the proper interpretation as to who should receive notice is that those who are to be taxed (*i.e.*, owners) should receive the notice. Plaintiffs support this argument by pointing out that the statute directs that the notice include "a notification that all interested persons owning real estate or taxable personalty" in the area will be given an opportunity to be heard at the hearing (Ill. Rev. Stat. 1975, ch. 120, pars. 1304(3) and 1307(3)) and that at the hearing "any interested person affected by the proposed special service area" may file written objections (Ill. Rev. Stat. 1975, ch. 120, par. 1306).

Plaintiffs also contend that the notice actually given in this case is insufficient. They argue that the procedure used to send out the 3957 notices was haphazard, especially when compared with the method used to ascertain the owners of record for judging the objector's petition's sufficiency. They particularly emphasize the discrepancy between 3957 notices and 6920 owners of record determined by the later more thorough search procedure and the fact that the evidence shows that a number of notices were sent to financial institutions without any cross-reference to

particular property owners thus making this possibility of forwarding extremely remote.

■■ After consideration of the statute, we conclude that the only logical interpretation of section 5 is that it directs notices to be mailed to owners of record. If the legislature had wished to provide that they be mailed to whoever in fact paid the taxes on a piece of property, it could have done so. However, it chose to use the phrase "in whose name" the taxes were paid. That terminology clearly brings to mind the situation where a mortgagee is paying taxes on behalf of an owner-mortgagor; the mortgagor in that instance would be the person in whose name the taxes are paid, and hence, the governmental authorities are presented with the task of determining who the mortgagor is when the tax records show that a mortgagee institution has paid the taxes on a property in order to mail the notice to the proper person.

■■ Despite the fact that the county sent some notices to financial institutions (presumably mortgagees) without any cross-reference to owners of record, and that the number of notices sent, even when increased by the likely number of joint owners' names placed on the envelopes, may still fall short of the 6920 owners of record subsequently computed by the county clerk, we find the notice afforded was sufficient to pass due process muster.

Due process is not a technical conception with a fixed content unrelated to time, place and circumstances; rather it is flexible and calls for such procedural protections as a particular situation demands (*Mathews v. Eldridge* (1976), 424 U.S. 319, 47 L. Ed. 2d 18, 96 S. Ct. 893; see also *Clark v. Morris*, 99 Ill. App. 2d 24, 240 N.E.2d 515). We are dealing here basically with a taxation proceeding which is *in rem* in nature. It has long been recognized that the process of taxation does not require the same kind of notice as in a judicial proceeding, where process is served to acquire jurisdiction of the parties and subject matter. (*In re Application of County Treasurer*, 26 Ill. App. 3d 753, 326 N.E.2d 120.) Publication alone might be sufficient to satisfy due process when dealing with such a process. (See *e.g., In re Application of County Treasurer.*) The notice required by the Special Services Act and actually given in this case was much more thorough.

We find that defendant Madison County substantially complied with the statutory requirement that notices be sent to the owners of the properties in the area. In the majority of cases the tax collector's books showed that the taxes for the preceding year were paid by individuals. The notices mailed to these people did in fact go to owners. Another portion of the notices were sent to owners in care of mortgagee instititutions and in all likelihood did reach the owners' hands. Although the record suggests that other owners other than plaintiffs Dyckman did

not receive actual mail notice, we believe in view of the fact that notice by publication was made and that numerous news articles about the project appeared in the local newspapers that we are safe in concluding that substantially all affected persons were aware of this opportunity to be heard in objection to the plan.

We do not hold that the notice given below was perfect but only that it was sufficient. We agree with plaintiffs that the more methodical method used to ascertain owners of record by use of the map of the area and the tax maps of the maps and plats department would be more efficient in determining to whom notices should be sent than the method employed.

For the foregoing reasons, we affirm the judgment and order of the circuit court of Madison County denying plaintiffs' injunction action.

Affirmed.

CARTER, P. J., and KARNS, J., concur.