Esther MILLER et al., Appellants,

v.

COVINGTON DEVELOPMENT
AUTHORITY et al., Appellees.

Charles D. MITCHELL et al., Appellants,

v.

COVINGTON DEVELOPMENT
AUTHORITY et al., Appellees.

Supreme Court of Kentucky.

June 25, 1976.

**2**

Samuel Milner, Eblen, Milner, Rosenbaum & Wilson, Lexington, R. Barry Wehrman, Covington, for appellants.

Jo M. Ferguson, Grafton, Ferguson, Fleischer & Harper, Louisville, Donald C. Wintersheimer, Covington, A. Wallace Grafton, Jr., Sheryl G. Snyder, Francis J. Mellen, Jr., Wyatt, Grafton & Sloss, Louisville, George F. Rabe, Lexington, for appellees.

Whayne C. Priest, Jr., Bowling Green, W. David Denton, Paducah, for amici curiae.

PALMORE, Justice.

This is a test suit to determine whether two acts of the 1974 General Assembly are valid. They are ch. 131, the Local Development Authority Act, and ch. 132, the Tax Increment Act, which have been placed in the statutes as KRS 99.610–99.680 and KRS 99.750–99.770, respectively. We find them both invalid.

Section 1 of the Local Development Authority Act states as its legislative policy "the preservation and revitalization of historically or economically significant local areas" in first and second-class cities and counties operating under the urban county form of government, "while at the same time accommodating necessary and desirable central city and suburban growth."

The LDA[1] Act creates an independent local agency consisting of the mayor or his designee as an ex officio nonvoting member and seven commissioners appointed by the mayor, with the approval of the governing body of the municipality, for staggered four-year terms. KRS 99.625.

Among the "public and essential governmental functions" it is expressly empowered to exercise is the threshold act of establishing a development plan fixing the boundaries of a project area and designating the "character and extent of the public and private land ownership and uses proposed within the area."[2] This plan must be "made available for public inspection," after which the LDA may among other things proceed to acquire any or all real or personal property within the project area, to clear any or all improvements or cause them to be renovated, to develop and construct residential housing for persons and families of lower income,[3] to subdivide, sell, lease, exchange, encumber or otherwise dispose of any of the property "at its fair cash value," notwithstanding the cost of its acquisition, for uses consistent with the development plan.[4] None of this requires approval by the municipal governing body.

With regard to its funds (a principal source of which is provided by the Tax Increment Act, discussed hereinafter), the LDA has these powers[5] (among others) within the jurisdiction of its municipal area for the purposes of developing the project area or areas, all without prior approval of the local governing body:

(1) To make, participate in or acquire loans for construction, development or rehabilitation of residential housing projects if it determines that such loans are not available from private lenders "upon reasonably equivalent terms and conditions;"

(2) To insure the payment of loans made by other lenders for those purposes if it

---

1. For brevity we thus abbreviate Local Development Authority and use the abbreviation to identify the local agency created for the purpose of implementing the Act.

2. KRS 99.655.

3. Defined as those who lack the income "necessary (as *determined by standards established by the agency*) to enable them, without finan-

cial assistance, to live in decent, safe and sanitary dwellings, without overcrowding." (Emphasis added.) KRS 99.615(14).

4. KRS 99.655, 99.650(d).

5. KRS 99.650(e), 99.650(d), 99.650(k)(2), 99.650(m), 99.650(*l*), 99.650(n), 99.670.

determines that such insurance is not available from private insurers "upon reasonably equivalent terms and conditions;"

(3) To *make grants* (that is, as we construe it, to donate, or give away) to builders, developers and owners of residential housing for the development, construction, rehabilitation or maintenance of residential housing as it "shall deem important for a proper living environment, all on such terms and conditions" as it may deem appropriate;

(4) To consent to modifications in the rate of interest, times of payment, or any other terms of loans and agreements relating to residential housing projects to which it is a party;

(5) To construct residential housing for persons and families of lower income, and to construct, through lessees, industrial buildings pursuant to KRS 103.200–103.285;

(6) To acquire, establish and operate, lease or sublease residential housing for persons and families of lower income, and to contract to assume the rights, powers, obligations and duties of any local housing authority or similar agency of the federal, state, city or urban county government;

(7) To make periodic *grants* to reduce principal and interest payments on mortgages or rentals payable by persons and families "of low income;"

(8) To borrow or accept funds from any source and, in that respect, to "include in any contract for financial assistance with the federal, state, city or urban-county government *any conditions which the federal, state city or urban-county government may attach to its financial aid*" not inconsistent with the purposes of the LDA Act (emphasis added); and

(9) To issue revenue bonds payable solely out of the revenues of the project, including tax increments released to the LDA pursuant to the Tax Increment Act.

The Tax Increment Act is less complex. Its fundamental provision is that any taxing district, including school districts, may contract to "release" to the LDA, for a period up to 25 years, not less than 50% or more than 95% of all ad valorem tax revenues received from a development or project area in excess of those received from the same area in the last year before its establishment.[6]

Obviously these two statutes have the constructive public purpose of enabling urban governments to attempt the revitalization of decaying "inner cities." The theory on which the hypothecation of future ad valorem tax revenues is justified is that in the long run the taxing districts will be repaid in the form of a greatly enhanced tax base and that the increased revenues ("increments") meanwhile released to the LDA and used by it to create this enhancement are revenues that would not have existed otherwise. We find no fault in the purpose or in the theory, but for the reasons that follow it is our opinion that each of the acts transcends the limits of the Kentucky Constitution.

We need not encumber our opinion with an excruciating analysis of what this and other courts have said in cases involving similar problems with different facts. Counsel for all parties are familiar with all the broad principles and ancient shibboleths of constitutional law, and recognize that each new application comes down to a matter of degree and calls for a value judgment. In this case the burden of casting that judgment rests finally on the seven elected members of this court.

We mention the word "elected" because it is appropriate to our assessment of the LDA Act. It is a fundamental proposition that a legislative body should not and ordinarily cannot divest itself of a legislative power. A state legislature may delegate legislative powers to cities because a state constitution gives it that right. Cf. Const. § 156. If, however, a state legislature purports to authorize a city to pass such powers on to an administrative agency, it attempts to authorize something it cannot do itself. For that reason cities

6. KRS 99.750, 99.760.

cannot be so authorized, notwithstanding the legislature's constitutional prerogative of prescribing the bounds of their powers. If there is one essential characteristic inherent in legislative power, it is that such power must be exercised by an elected representative or representatives of the people, and not by a person, persons or agency created or designated by those representatives. Therein, we think, lies the major flaw of the LDA Act. It authorizes the agency to exercise choices that the people are entitled to have exercised by their elected representatives.

In other instances too numerous to recount, delegations of authority have been upheld on the theory that the legislative body has prescribed standards or safeguards that so confine the administrative body's powers that it can be said that they do not exceed the scope of mere details in the execution. In our judgment they are not so confined here, nor do we have the safeguard of a long-established administrative agency such as a state highway department or department of education, with a track record of experience and expertise in a well-recognized field. Nor, indeed, are the powers delegated to the LDA confined to matters so involved or so beyond the technical competence of a legislative body that it would be unrealistic not to vest them in an administrative agency.

Take for example the very first choice the LDA is required to make, the choice of an area. By what legislative criteria is the agency restricted in arriving at this vital decision? Only by its own notions of whether the area is economically or historically "significant". Considering the emphasis placed by the remaining provisions of the Act upon revitalization of the area by means of "development," one might reasonably conclude that the "historical" aspect of this two-headed criterion is of dubious practical importance, and we so regard it. The real thrust of the Act is toward economic development. What then is to characterize an area as "economically significant"? In-

deed, is there any real estate, or any area, within a city that is *not* "economically significant"? And if there are certain areas of a city that can be classified as depressed and dying, and for that reason subjected to radical cosmetic surgery, what is to prevent the elected representatives of that city either from determining its boundaries themselves or from prescribing some tangible formulae or criteria by which it is to be done, and is there any practical reason why that responsibility should be shifted to another layer of officialdom that is not directly responsible to the electorate? We think these questions go to the heart of the delegability question, and the answer is that there is no substantial reason for the ultimate choice not to be made by the legislative body, as it must be made, for example, in the case of zoning[7] or urban renewal.[8] Certainly it does not appear to be justified in terms of "the practical needs of effective government." Cf. *Butler v. United Cerebral Palsy of Northern Kentucky, Inc.*, Ky., 352 S.W.2d 203, 208 (1961).

The constitutional authority of any administrative agency to make a final decision on any question that lies within the authority of the direct representatives of the electorate to decide owes its existence to one of two pragmatic factors. Either, as in the instance of activities usually labeled "ministerial," the matters decided are not of sufficient public importance or impact to warrant the day-to-day attention of "the boss" (the legislative body) or, if they are of such importance, for some practical reason or reasons identifiable by the exercise of common sense they cannot be effectively handled by the legislative body itself. In theory if not in fact, the major administrative agencies that conduct substantial segments of government today live by virtue of the latter supposition. Since, however, this basis for administrative authority runs counter to the idea of unfettered democratic choice, and removes the exercise of discretion one step beyond that which is contemplated by representative government

---

7. Cf. KRS 100.207, 100.211, 100.297(2), 100.-321.

8. Cf. KRS 99.370(6) and (7).

through elected legislators, we think that sound jurisprudence must confine it to instances of clear necessity.[9] It is understandable that the federal Congress cannot survey the boundaries for national parks or choose the sites of federal buildings, nor could a state legislature be expected to make such decisions directly. Within the much smaller bounds of a city or county, however, the problem is not so formidable, and the question of necessity may not result in the same answer.

It is for the broad reason that the LDA Act unnecessarily empowers a legislative choice to be delegated away that we hold it invalid under Const. §§ 27, 28. We do not reach the due process and other arguments leveled at the Act, nor do we pass on the validity of the various grants of authority [10] heretofore mentioned for the purpose of illustrating the great scope of discretionary power vested in the administrative agency by the statute.

█ The Tax Increment Act is even more clearly in violation of the Constitution. Const. § 184 has always been construed as meaning that money collected for the purposes of education in the common school system cannot be spent for any other purpose, public or not. Cf. *Pollitt v. Lewis*, 269 Ky. 680, 108 S.W.2d 671, 113 ALR 691 (1937). It is no answer to say that the tax increments will be money the schools would not have had anyway, because the fact is that neither could this portion of the tax increments ever be realized except through taxes levied for and in the name of the common schools. It is also irrelevant, we think, that as a practical matter tax increment financing eventually will increase the revenues of a school district by enhancing its tax base, or that the redevelopment of depressed areas may increase the average levels of student achievement by improving the environment in which the students live. The stubborn fact remains that school taxes can be raised only for school purposes, and

there is neither jot nor tittle in either of these two legislative acts, singly or together, that suggests the improvement of schools or the improvement of education as being among its objectives. Every bet made at the racetrack benefits the public through the pari-mutuel taxes collected by the state, but we have yet to hear it suggested that one's losses may be deducted as charitable contributions. If tax increment financing under these acts will confer any benefit on the school districts involved, it is purely incidental, fortuitous, far in the future, and at this point speculative. Meanwhile, it envisions that during an uncertain interim all or an undetermined portion of the present tax base will be completely destroyed through public acquisition and ownership.

█ We think also that although in other cases this court has held that various excise taxes may be pledged as the source of bond payments under the "special fund" theory, ad valorem taxes cannot be put in that category. Though property taxation probably is the most unpopular kind of governmental financing in the world of today, our 1891 Constitution, which the people more than once in modern times have vigorously declined to submit to wholesale revision, clearly established it as the staple commodity of local governmental sustenance. The ad valorem tax is the one tax that is mandatory. Const. § 174; *Raydure v. Board of Sup'rs of Estill County*, 183 Ky. 84, 209 S.W. 19, 25 (1919); *Levi v. City of Louisville*, 97 Ky. 394, 16 KLR 872, 30 S.W. 973, 974, 28 LRA 480 (1895). It is a tax the city has no option to discontinue, and is the ultimate resource of its fiscal integrity. Any obligation that is payable from it is a debt within the meaning of Const. § 157. Cf. *Sawyer v. Jefferson County Fiscal Court*, Ky., 438 S.W.2d 531, 533 (1969).

The judgment is reversed.

All concur.

9. "The purpose of the nondelegation doctrine should no longer be either to prevent delegation or to require statutory standards; the purpose should be the much deeper one of protecting against *unnecessary and uncontrolled dis-* *cretionary power.*" (Emphasis added.) Davis, Administrative Law Text (3d ed., 1972), § 2.08.

10. Some of which strike us as rather startling.