(No. 52151.-

THE PEOPLE *ex rel.* THE CITY OF CANTON, Appellee,
v. HARLAN E. CROUCH, Mayor, Appellant.

*Opinion filed March 28, 1980.*

358

CLARK and MORAN, JJ., dissenting.

Richard A. Miller, of Chicago, for appellant.

John J. McCarthy, of Canton (Kai Allen Nebel, Angelika Kuehn and Robert J. Best, of Boodell, Sears, Sugrue, Giambalvo & Crowley, and Jack B. Teplitz, of counsel), for appellee.

Fred P. Bosselman, Tobin M. Richter and Linda A. Malone, of Chicago, and Craig A. Peterson, of Evanston (Ross, Hardies, O'Keefe, Babcock & Parsons, of counsel), for *amicus curiae* Karting Grand Prix, Ltd.

Brian M. Memenoff, of Peoria, for *amicus curiae* city of Peoria.

PER CURIAM: The mayor of the city of Canton, Harlan E. Crouch, appeals from a judgment of the circuit court of Fulton County entered in a *mandamus* proceeding brought against the mayor by the city. The petition for a writ of *mandamus* was filed to compel the mayor to execute two general obligation bonds authorized by a municipal ordinance adopted July 5, 1978. The mayor, in a letter to the city council, refused to execute the bonds, stating that he could not because there was some doubt as to the "validity, interpretation, and constitutionality" of the enabling act, the Real Property Tax Increment Allocation Redevelopment Act (hereinafter the Act) (Ill. Rev. Stat. 1977, ch. 24, pars. 11—74.4—1 through 11—74.4—11). The circuit court did not agree and, based

upon the pleadings, a stipulation of fact and multiple exhibits, denied the mayor's motion for summary judgment and entered summary judgment in favor of the city. The mayor appealed to the appellate court and the cause was transferred to this court pursuant to Rule 302(b) (73 Ill. 2d R. 302(b)).

The issue presented is whether the Act is constitutional. The Act became effective January 10, 1977. Its stated purpose is to eradicate blighted conditions and prevent new ones from occurring. The intent of the Act is to redevelop blighted areas so as to prevent the further deterioration of the tax bases of these areas and to remove the threat to the health, safety, morals and welfare of the public which blighted conditions present. (Ill. Rev. Stat. 1977, ch. 24, pars. 11—74.4—2(a), (b).) The General Assembly declared:

> "[I]ncremental tax revenues derived from the tax rates of various taxing districts in redevelopment project areas for the payment of redevelopment project costs is of benefit to said taxing districts for the reasons that taxing districts located in redevelopment project areas would not derive the benefits of an increased assessment base without the benefits of tax increment financing ***." Ill. Rev. Stat. 1977, ch. 24, par. 11—74.4—2(c).

The procedure under the Act authorizes public hearings and, subsequently, the passage of an ordinance designating a redevelopment project area, as defined in section 11—74.4—3(h) (Ill. Rev. Stat. 1977, ch. 24, par. 11—74.4—3(h)), and approving a redevelopment plan or project (Ill. Rev. Stat. 1977, ch. 24, par. 11—74.4—5). Notice of the hearing is required to be given to property owners within the redevelopment area, both by publication and mailing. (Ill. Rev. Stat. 1977, ch. 24, par. 11—74.4—6.) Once an ordinance authorizing a redevelopment plan and project and designating a redevelopment project area is adopted, the municipality is granted a panoply of powers to carry the plan into effect. For example,

the municipality may: make and enter into all necessary or incidental contracts; acquire property by purchase, donation, lease or eminent domain; own, convey, lease, mortgage or otherwise dispose of property; demolish, remove, renovate, rehabilitate or construct any structure or building within a redevelopment project area; incur development costs, create a commission to exercise powers under the Act; and exercise any and all other powers necessary to effectuate the purposes of the Act. Ill. Rev. Stat. 1977, ch. 24, par. 11—74.4—4.

Additionally, the municipality may issue bonds, incur other obligations and pledge the full faith and credit of the municipality as well as the net revenues from, and taxes collected on, the redevelopment project area as collateral for repayment of its obligations. The obligations must have a maturity date not exceeding 20 years. The ordinance authorizing the obligations may provide that the obligations shall contain a recital that they are issued pursuant to the Act, which recital shall be conclusive evidence of their validity and of the regularity of their issuance. The debt incurred by a municipality pursuant to the Act is exclusive of any statutory limitation upon the indebtedness a taxing district may incur. Ill. Rev. Stat. 1977, ch. 24, par. 11—74.4—7.

Once an ordinance is passed which adopts tax increment allocation financing, the county clerk immediately thereafter determines the most recently ascertained equalized assessed value of each lot, block, tract or parcel of real property within the redevelopment project area. That value is designated the "initial equalized assessed value." The county clerk adds these values together to reach the "total initial equalized assessed value" of all the taxable real property within the project area. The "total initial equalized assessed value" is then used to compute the rate per cent of tax with respect to every taxing district in the redevelopment project area in lieu of the current equalized

assessed value of all taxable real property, for as long as tax increment allocation financing is in effect. (Ill. Rev. Stat. 1977, ch. 24, par. 11—74.4—9.) Each year after the adoption of the ordinance, until redevelopment costs are paid, those real property taxes which are attributable to the initial equalized assessed value shall be paid by the taxpayers to the various taxing districts in the manner required by law in the absence of the adoption of tax increment allocation financing. (Ill. Rev. Stat. 1977, ch. 24, par. 11—74.4—8(a).) That portion of taxes which is attributable to the *current* equalized assessed value over and above the *initial* equalized assessed value of all taxable property in the project area shall be allocated to and, when collected, shall be paid by the county collector to the municipal treasurer, who shall deposit the taxes into a special fund called the special tax allocation fund of the municipality for the purpose of paying redevelopment-project costs and obligations incurred in the payment thereof. (Ill. Rev. Stat. 1977, ch. 24, par. 11—74.4—8(b).) Once all redevelopment costs and obligations are paid, all surplus funds remaining in the special tax allocation fund shall be paid by the municipal treasurer to the county collector for payment to the taxing districts in the redevelopment area.

The unique part of tax increment allocation financing is that the Act permits tax increments attributable to an increase in real property values to be paid from each taxing district which overlaps with the project area to the municipality. In the case at bar, the taxing districts affected are the County of Fulton, Canton Township, Canton Park District, the Spoon River College District, Canton Union School District No. 66 and the city of Canton. After the ordinance was adopted designating a downtown redeveopment project area and approving a redevelopment plan and project, the city authorized the sale of tax allocation bonds. It is these bonds which the mayor refuses to exe-

cute.

We have reviewed the briefs of the parties and the two *amici,* as well as the record on appeal. We agree with the mayor that the tax increment scheme is a "novel proposition," but we are unable to say it violates any constitutional provision. Accordingly, we affirm.

The first contention raised by the mayor in essence is that the redevelopment of blighted private commercial areas within a municipality is not a public purpose with respect to municipalities, counties, townships, park districts, school districts and other limited-purpose units of government.

This court addressed this issue recently in *People ex rel. City of Urbana v. Paley* (1977), 68 Ill. 2d 62. That case was also a *mandamus* proceeding, brought by the city to compel the mayor to execute certain general obligation bonds and interest coupons for the purpose of acquiring a parcel of land for an urban development program. The court said:

> "It is well established that the elimination of a blighted area is itself a public purpose, whether its characterization as blighted results from its physical condition or its unmarketability. *(People ex rel. Gutknecht v. City of Chicago* [1953], 414 Ill. 600.) This is no less true when the purpose of the municipality is the prevention, rather than elimination, of blight which has not yet begun or which, though begun, has not yet reached its apex." (68 Ill. 2d 62, 73.)

Further, the court stated in *Paley*:

> "[T]he fact that the statute provide[s] an impetus to *economic development* satisfie[s] the requirement of public purpose. *** [T]he city's determination to promote the commercial rebirth of its downtown area is a public purpose satisfying the requirements of article VIII, section 1(a), and the

due process clause [of the 1970 Constitution]."
(68 Ill. 2d 62, 74.)

Thus, we conclude that, as to the city of Canton, the Act fulfills the constitutional requirement that municipal revenues spent to eliminate urban blight, as contemplated under this act, are spent for a legitimate public purpose.

We need to decide, however, whether tax revenues may be collected from the other taxing districts and expended by the city in order to carry out a redevelopment plan within the city. It is argued by the mayor that some of the other taxing districts, such as the Spoon River Junior College District and the Park District, may distribute their revenues for limited purposes only. Thus, argues the mayor, the revenues collected by the various special taxing districts may only be spent to advance the corporate purpose for which they were created and not to assist in redeveloping the city of Canton. We do not agree that a corporate purpose of *each* taxing district needs to be fulfilled in this case in order for the legislature to constitutionally authorize the elimination of urban blight. The single constitutional requirement in this regard is that public funds, property or credit be used only for *public* purposes. (Ill. Const. 1970, art. VIII, sec. 1(a); *People ex rel. City of Urbana v. Paley* (1977), 68 Ill. 2d 62, 75; *People ex rel. City of Salem v. McMackin* (1972), 53 Ill. 2d 347, 354.) In *Paley,* we explicitly concluded that "the application of the public-purpose doctrine to sanction urban redevelopment can no longer be restricted to areas where crime, vacancy, or physical decay produce undesirable living conditions or imperil public health. Stimulation of commercial growth and removal of economic stagnation are also objectives which enhance the public weal. [Citations.] " *People ex rel. City of Urbana v. Paley* (1977), 68 Ill. 2d 62, 74-75.

In *People ex rel. Sanitary District v. Schlaeger* (1945), 391 Ill. 310, an amendment to the election law was chal-

lenged. The amendment provided that counties, munici-
palities and taxing districts participating in and benefiting
by elections, are required to apportion the costs of elec-
tions. After the sanitary district failed to pay its costs, the
county collector deducted tax revenue intended for the
district and credited the revenue to the county clerk as
reimbursement for having paid the sanitary district's
costs. The sanitary district complained that the State
lacked authority to deduct such amounts because they
constituted an unlawful State tax for a local purpose and
because the amendments embraced subject matter not ex-
pressed in the title or germane to the act amended. This
court rejected both of the sanitary district's arguments.
In holding that the deductions for elections were for a
valid public, as opposed to a local, purpose, it was said:

"The legislature may direct a municipality, as an
agency of the State, to perform any governmental
function of the State. In such case the municipality
simply becomes an agency of the State. The power
in all its aspects remains in the legislature, un-
changed and unaffected by the delegation to the
agent. It is delegated to smaller municipalities only
that it may be more effectively exercised. [Cita-
tion.] " (391 Ill. 314, 323-24.)

Moreover, it was there stated:

"It has been frequently held by this court that
corporate purposes, within the meaning of the con-
stitutional provisions here invoked, do not include
functions which a municipal corporation performs
in its governmental capacity as an agency of the
State, although the performance of the duty will
create a debt to be paid by local taxation. [Cita-
tions.]

* * *

*** The powers, duties and liabilities of mu-
nicipal corporations, unless restrained by constitu-

tional limits, are wholly under the control of the General Assembly. It may compel a municipal corporation to perform any duty which relates to the general welfare and security of the State, although the performance of that duty will create a debt *to* be paid by local taxation. [Citation.] " (*People ex rel. Sanitary District v. Schlaeger* (1945), 391 Ill. 314, 324-25.) (Accord, 16 McQuillin, Municipal Corporations sec. 44.18 n.6 (3d ed. 1979).) We conclude therefore that the enactment of the Act was for the purpose of promoting the public purpose of the State in reducing unemployment, relieving urban blight and increasing the general tax base.

Additionally, the mayor's argument fails to consider the clear language of the 1970 Constitution permitting the use, among governmental units, of one another's revenues. Article VII, section 10(a), provides:

"SECTION 10. INTERGOVERNMENTAL COOPERATION

(a) Units of local government and school districts may contract or otherwise associate among themselves, with the State, with other states and their units of local government and school districts, and with the United States to obtain or share services and to exercise, combine, or transfer any power or function, in any manner not prohibited by law or by ordinance. Units of local government and school districts may contract and otherwise associate with individuals, associations, and corporations in any manner not prohibited by law or by ordinance. Participating units of government may use their credit, revenues, and other resources to pay costs and to service debt related to intergovernmental activities."

That this provision was intended to permit the multidistrict taxation scheme embraced by the Act in issue herein seems clear. Also, in light of the following exchange during the 1970 constitutional convention, it is clear that the drafters' intent was to include school districts under

the scheme:

"MR. KAMIN: Mr. Stahl and Mr. Wenum, I am having a little trouble with a potential ambiguity in the language. You have taken care, throughout the rest of the article, to keep school districts separate from units of local government—the definitional section, in particular; and my question is this: Does the language 'among themselves' mean that school districts can associate with only other school districts? Or does it mean that they can associate with any other unit of local government?

MR. WENUM: There is certainly no intention that that meaning be implied. The intent, indeed, is precisely the opposite. There are already examples in some municipalities where school districts and, for example, park districts cooperate in the utilization of land space, recreational facilities—indeed, enter into cooperative ventures in terms of summer programs where the park facilities are overcrowded and the school facilities are hardly used at all. We do not envision that kind of prohibition. Indeed, we would hope that school districts could cooperate like any other unit of government with any unit of government where that cooperation would be mutually beneficial to the units involved and to their people.

MR. KAMIN: Let me ask you this, then: In addition then, do you—you use in this article, I think, for the first time in the section, the words 'unit of government.' Your unit of government does not appear in the definitional section. I take it a school district is a unit of government.

MR. STAHL: Yes, although it is not a unit of local government.

MR. WENUM: It is a unit of government. Indeed, we anticipate because of what we are trying to do in this section that 'unit of government' spans any level—federal, state, local—so that this question of cooperation can be resolved at whatever levels are necessary to effect the best possible level of services to the people involved." (4 Record of Proceedings, Sixth Illinois Constitutional Convention 3422.)

In *Miller v. Covington Development Authority* (Ky. 1976), 539 S.W.2d 1, the Supreme Court of Kentucky declared the Kentucky Tax Increment Act invalid for the reason

that it violated the constitutional provision whereby tax revenues levied for the purpose of education "shall be appropriated to the common schools, and to no other purpose." (Ky. Const. sec. 184.) The fact that our constitution provides for no such limitation on education revenues, and in fact encourages intergovernmental cooperation, compels us to reach the conclusion that the decision in *Miller* has no application in this case.

Finally, we think that public funds will not be used to finance private commercial development, as is argued by the mayor. The municipality may lease, mortgage or otherwise dispose of property within the redevelopment area. These acts could hardly be performed without the participation of private commercial developers. There is no constitutional prohibition forbidding such participation. As this court has repeatedly stated in this connection:

> " '[I] f the principal purpose and objective in a given enactment is public in nature, it does not matter that there will be an incidental benefit to private interests. (*E.g., People ex rel. Adamowski v. Chicago Railroad Terminal Authority* (1958), 14 Ill. 2d 230, 236; *People ex rel. Gutknecht v. City of Chicago* (1953), 414 Ill. 600, 611, 612; *Poole v. City of Kankakee* (1950), 406 Ill. 521, 530; *Cremer v. Peoria Housing Authority* (1948), 399 Ill. 579, 591-592.)
>
> \* \* \*
>
> We have indicated that there is no constitutional prohibition against the use of public funds which inure to the benefit of private interests, so long as the money is utilized for a public purpose.'

The above is no more than a statement of a widely accepted rule of law. (See, *e.g., Berman v. Parker* (1954), 348 U.S. 26, 33-34, 99 L. Ed. 27, 38, 75

S. Ct. 98, 102-03; *Baycol, Inc. v. Downtown Development Authority* (Fla. 1975), 315 So. 2d 451, 455-56; *State ex rel. Atkinson v. Planned Industrial Expansion Authority* (Mo. 1975), 517 S.W.2d 36, 45; *Levin v. Township Committee* (1971), 57 N.J. 506, 543-45, 274 A.2d 1, 21-22; *Yonkers Community Development Agency v. Morris* (1975), 37 N.Y.2d 478, 482, 335 N.E.2d 327, 331.)" *People ex rel. City of Urbana v. Paley* (1977), 68 Ill. 2d 62, 75-76, quoting *People ex rel. City of Salem v. McMackin* (1972), 53 Ill. 2d 347, 355, 359.

We hold therefore that the portion of the Act which permits revenues collected by various taxing districts, including school districts, to be paid over to the municipal treasurer for the purpose of paying the costs and servicing debt arising out of a redevelopment plan serves a valid public purpose and is constitutional.

The next several assignments of error raised by the mayor argue that the system of taxation established in the Act violated the Federal and State due process and equal protection guarantees of the taxpayers in the various taxing districts; that the system of taxation offends the uniformity clause of both constitutions; that it permits an improper delegation of legislative authority; that it is contrary to the separation of powers clause; and that it allows an impairment of the contracts the other taxing districts might enter into in the future.

Each of these contentions is based on the argument that the Act is defective because it permits tax revenues levied and collected within one taxing district to be paid over to another taxing district for its use. As we have previously discussed, our constitution specifically provides for sharing of credit, revenues, and other resources among units of government, including school districts. (Ill. Const. 1970, art. VII, sec. 10(a).) It is not the function of this

court to assess the advisability of taxation schemes, or to make judgments concerning the relative difficulty of measuring tax increments in light of inflation and normal dips and rises in real property values. The social utility or feasibility of legislative decisions is not within the scope of our function. In this case, we are concerned only with the constitutionality of the act in question.

> " '[L]egislative bodies have very broad powers in establishing classifications defining the objects of taxation which will withstand constitutional attack so long as the classifications are reasonable. [Citations.] The legislative determination as to those persons who are to be taxed and those not taxed must not be arbitrary [citation], and the classification must bear some reasonable relationship to the object of the legislation [citation]. However, it is equally well settled that there is a presumption favoring the validity of classifications made by legislative bodies in taxing matters and that one who attacks them has the burden of proving such classifications to be arbitrary and unreasonable.' [Citations.] " (*Kerasotes Rialto Theater Corp. v. City of Peoria* (1979), 77 Ill. 2d 491, 495-96, quoting *Williams v. City of Chicago* (1977), 66 Ill. 2d 423, 432-33.)

Accord *Lehnhausen v. Lake Shore Auto Parts Co.* (1973), 410 U.S. 356, 35 L. Ed. 2d 351, 93 S. Ct. 1001; 16 McQuillin, Municipal Corporations sec. 44.20 (3 ed. 1979).

The General Assembly has determined that those tax revenues which are directly attributable to the increase in property values caused by a redevelopment project should be paid from the various taxing districts which are favorably affected by the project to the muncipality in which the project is located. The General Assembly has stated that, were it not for the redevelopment project, the taxing districts would not receive such revenue. (Ill. Rev.

Stat. 1977, ch. 24, par. 11—74.4—2(c).) We think it is reasonable for the increments to be used to retire the debt which was incurred to implement the redevelopment plan.

The mayor argues that taxpayers residing in parts of a taxing district outside the area of the municipality will be taxed at a greater rate as a result of the Act, and that they are taxed differently than taxpayers residing in districts which are not participating in a tax increment allocation plan. The mayor asserts that such classifications are arbitrary and thus violative of the due process and equal protection clauses. We disagree. The classifications are based on the need, perceived by the General Assembly, to eliminate or prevent urban blight. Within each taxing district, only those revenues which can reasonably be found to have been raised by the implementation of the redevelopment plan can be deposited in the special tax allocation fund. Thus, only those taxing districts, and within each taxing district only that part of it which has enjoyed an increase in revenues as a result of redevelopment, will be required to turn over revenue to the municipality. We do not think the mayor has carried the burden of proving the classifications to be either arbitrary or unreasonable; he has not negated every conceivable basis which might support the classifications. (*Continental Illinois National Bank v. Zagel* (1979), 78 Ill. 2d 387; *Berry v. Costello* (1976), 62 Ill. 2d 342, 345.) The Act does not offend the due process or the equal protection clauses.

The same may be said for the mayor's argument that the Act violates the uniformity clause. Those taxpayers who will directly benefit from redevelopment will pay taxes to the municipality while those further removed physically from the redevelopment area will have fewer, if any, tax revenues paid over to the municipality. We are unable to say that such a scheme is arbitrary or unreasonable.

The mayor and one *amicus* next urge reversal because the Act is vague and indefinite and thus constitutes an improper delegation of legislative authority to the municipality empowered to enforce the Act. In support of this charge, the mayor asserts that no standards are laid down to guide the municipality in exercising the various powers it possesses under the Act. The mayor also argues that the separation of powers clause of article II, section 1, of the Illinois Constitution is violated by a grant of executive and legislative authority to the municipality under the Act; moreover, that the vague and indefinite features of the Act represent a denial of due process; and that the Act is special, not general, legislation.

These arguments lack merit. The mayor states that the Act does not set standards as to prices the municipality should pay to acquire property or as to prices or rents the municipality should receive for the sale or lease of redeveloped property. The mayor suggests other areas where discretion is vested in the municipality, and characterizes these grants of discretion as unconstitutional. We do not agree because the General Assembly sufficiently defines the purposes for which these discretionary grants are to apply. That is, the Act provides that the powers delegated to the municipality are to be used specifically to eliminate or prevent urban blight. Moreover, the Act permits the municipality to exercise its unquestioned powers of eminent domain to acquire property, as well as permitting the development and disposition of property, general powers which have been upheld by this court several times in the past. See *e. g., Coryn v. City of Moline* (1978), 71 Ill. 2d 194 (special services act (Ill. Rev. Stat. 1977, ch. 120, par. 1301 *et seq.*)); *People ex rel. City of Salem v. McMackin* (1972), 53 Ill. 2d 347 (Industrial Project Revenue Bond Act (Ill. Rev. Stat. 1977, ch. 24, par. 11–74–1 *et seq.*)); *People ex rel. Gutknecht v. City of Chicago* (1953), 414 Ill. 600 (amendments to the Blighted

Areas Redevelopment Act of 1947 (Ill. Rev. Stat. 1949, ch. 67½, par. 63 *et seq.*)); *People ex rel. Tuohy v. City of Chicago* (1948), 399 Ill. 551 (Blighted Areas Redevelopment Act of 1947 (Ill. Rev. Stat. 1947, ch. 67½, par. 63 *et seq.*)); State grant act (Ill. Rev. Stat. 1947, ch. 67½, par. 53 *et seq.*)); rehousing act (Ill. Rev. Stat. 1947, ch. 67½, par. 92 *et seq.*)).

Thus the Act sufficiently identifies the harm to be prevented (urban blight) and the general means available to the municipality (and the commission it may establish) to prevent the harm (*e.g.*, eminent domain, issuance of bonds, sale or lease of property). (See *Stofer v. Motor Vehicle Casualty Co.* (1977), 68 Ill. 2d 361, 372 (where a test was laid down which may be used to determine whether adequate standards were provided to administrative agencies so as to assure legislative conformance with the delegation of powers doctrine).) Therefore, the powers granted to the municipality under the Act, while necessarily stated in general terms (*Paper Supply Co. v. City of Chicago* (1974), 57 Ill. 2d 553, 580), are, because they have been exercised in the past by municipalities and because they are inexorably connected with and restricted to the clearly stated legislative goal of relieving urban blight, not void for vagueness, indefiniteness and uncertainty.

For the same reasons we think the mayor's contention that the Act violates the separation of powers clause must fail. The General Assembly has empowered the municipality to do a variety of acts, all designed to accomplish one legislatively directed object. The municipality may execute the objective of the General Assembly, but it must stay within the bounds of the Act. It may only perform those acts, and in the manner provided for, expressly contained in the Act. We think sufficiently clear criteria are laid down for the municipality to do this, and we reject the mayor's argument that any unauthorized

power has been delegated to the municipality.

A law is general instead of special legislation if it operates uniformly throughout the State in all localities on all persons in like circumstances and conditions. (*People ex rel. Hanrahan v. Caliendo* (1971), 50 Ill. 2d 72, 85.) In the foregoing case, the validity of the Urban Transportation District Act (Ill. Rev. Stat. 1977, ch. 111 2/3, pars. 501 through 518) was in issue. In response to the assertion that that act constituted a special or local law in violation of article IV, section 22, of the 1870 Constitution, this court said: "By its terms the Act applies to all municipalities of the State 'in which inadequate or outmoded public transportation facilities and/or services exist.' Ill. Rev. Stat. 1969, ch. 111 2/3, par. 502." (*People ex rel. Hanrahan v. Caliendo* (1971), 50 Ill. 2d 72, 85.) Thus, that act was general in nature. The same conclusion is inescapable in this case. Any municipality may choose to participate in tax increment allocation financing. The Act operates uniformly throughout the State with regard to all municipalities. The Act is a general law.

The mayor next argues that the Act is unconstitutional in that is impairs the obligation of the various taxing districts' contracts in violation of article I, section 16, and article XIII, section 5, of the Illinois Constitution of 1970. Those sections provide:

> "No *** law impairing the obligation of contracts *** shall be passed." Ill. Const. 1970, art. I, sec. 16.

> "Membership in any pension or retirement system of the State, any unit of local government or school district, or any agency or instrumentality thereof, shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired." (Ill. Const. 1970, art. XIII, sec. 5.)

The mayor points out that sometime in the future the various taxing districts may be unable to meet their obligations and that the Act may contribute to that result. He does not explain exactly how the Act would do so,

however. In an analogous context it was said: "Factual and legal decisions that may thereafter arise are not now present for decision." (*Mahin v. Baltis* (1966), 34 Ill. 2d 413, 421 (constitutionality of an amendment to the Chicago sanitary district act (Ill. Rev. Stat. 1963, ch. 42, par. 323.30a)). We need not decide this question.

The mayor's penultimate ground for reversal is that specific recommendations for change made by the Governor exceeded the scope of the amendatory veto power granted in article IV, section 9(e), of the 1970 Constitution. The recommendations for change, all of which were accepted by the General Assemby, related to, *inter alia*: the requirement of an estimated completion date for any redevelopment plan; the requirement of an ordinance to authorize each disposition of property; a section requiring the disclosure by municipal officers of any interest in property affected by the redevelopment plan; and the requirement that each taxing district receive notice by mail and publication of all changes in a redevelopment plan, project or area.

The amendatory veto power of the Governor has arisen in other cases decided by this court. While the power has not been given precise boundaries in these cases, it is possible to say that the power does not extend to the point where the Governor may make a substitution of completely new bills. (*People ex rel. Klinger v. Howlett* (1972), 50 Ill. 2d 242, 249.) Nor does it extend to the point that it may change the fundamental purpose of the legislation, nor make substantial or expansive changes in the legislation. (*Continental Illinois National Bank v. Zagel* (1979), 78 Ill. 2d 387.) The constitutional provision authorizes "specific recommendations for change." (Ill. Const. 1970, art. IV, sec. 9(e).) It is clear that the power encompasses more than mere proofreading to correct technical errors. It therefore becomes a question of guided discretion to judge whether the changes are less than

fundamental alterations but more than technical correc-
tions. We think the changes made in the act at bar fall
within that middle area. They were intended to improve
the bill in material ways, yet not to alter its essential pur-
pose and intent. The changes constituted minor enhance-
ments which spoke to the clarity, fairness and practical
requirements of the Act. They did not exceed the scope of
the Governor's amendatory veto power.

Finally, the mayor urges that the Act expressly
amended various laws without setting forth completely
the sections amended, in contravention to article IV,
section 8(d), of the 1970 Constitution. Section 8(d)
provides: "A bill expressly amending a law shall set forth
completely the sections amended."

The mayor argues that the Act amends legislation in
six instances without referring to what legislative authority
exists already or how the Act is amending that authority.
In the first instance, the mayor argues that if elimination
of urban blight is a corporate or public purpose of
counties, townships, school districts and other units of
government, the acts creating such units should be
amended to so provide. As we have previously held herein,
eradicating urban blight is a valid public purpose of the
State which the General Assembly may attempt to
accomplish by delegating, to a limited degree, some of its
power to local units of government. While each unit of
government may have its own local and corporate pur-
poses the public purposes of the State may sometimes be
carried out through the local units of government. No
amendment is needed to explicate this principle.

Another instance cited by the mayor is set forth in
the official text of the Act. That instance relates to the
requirement that tax rates be set exclusively on the basis
of equalized assessed values. The text of the act here in
question does expressly amend the applicable section of
the Revenue Act of 1939 to allow for the effect the

instant act has upon the Revenue Act. (1976 Ill. Laws 1895.) The other instances which the mayor argues require that amended sections be set forth completely involve: the presumption that bonds issued by the municipality under the Act are valid; the potential pledges of the full faith and credit of the municipality; a reference to alternative statutory methods of issuing obligations; and an exclusion from debt-limitation levels set by other legislation. In any event, we think that the remaining instances raised by the mayor properly are within the following rule:

"Where a law is complete in itself, it is valid although its effect may be to repeal, modify, or amend existing laws by implication. [Citations.] It is not necessary, when a new act is passed, that all prior acts modified by it by implication shall be re-enacted and published at length. [Citation.] " *Jordan v. Metropolitan Sanitary District* (1958), 15 Ill. 2d 369, 378.

Accord: *People ex rel. Sanitary District v. Schlaeger* (1945), 391 Ill. 314, 329; *People ex rel. Kucharski v. Hiering* (1971), 49 Ill. 2d 304, 307; *United Private Detective & Security Association v. City of Chicago* (1976), 62 Ill. 2d 506, 516; 1A Sutherland, Statutes and Statutory Construction secs. 22.13, 22.20, 22.21 (4th ed. 1972 & Supp. 1979).

One of the *amicus* briefs filed in this cause argues that summary judgment was improperly granted because several issues of fact exist in this case. These factual questions relate to the terms of the bonds to be issued by the municipality, the bonds' issuance date and value, and the contracts of the various taxing districts which might allegedly be impaired. In light of our resolution of the issues involved herein, we do not consider these questions to be material to the constitutionality of the Act.

In sum, the elimination of urban blight in the city of Canton is within the ambit of the public-purpose doctrine.

The taxation scheme contemplated under the Real Property Tax Increment Allocation Redevelopment Act does not deny taxpayers in the various taxing districts due process or equal protection of the laws. The scheme of taxation is uniform as applied to all persons within a similar classification. The powers delegated by the General Assembly to the municipality are properly clear and definite. There is no impairment of obligations of contracts under the facts presented here. The Governor did not exceed his amendatory authority, and, the Act is not an amendatory act as that term is contemplated within article IV, section 8(d), of the Constitution. The mayor therefore erroneously refused to execute the bonds; " 'the signature of the mayor to these instruments is purely a ministerial act. *Mandamus* is an appropriate form of action under these circumstances.' " (*People ex rel. City of Urbana v. Paley* (1977), 68 Ill. 2d 62, 78, quoting *People ex rel. City of Salem v. McMackin* (1972), 53 Ill. 2d 347, 353.) The judgment of the circuit court of Fulton County, issuing a writ of *mandamus* directing the mayor to execute the bonds, is affirmed.

*Judgment affirmed.*

MR. JUSTICE CLARK, dissenting:

I respectfully dissent from the majority opinion. I think that the taxation scheme contemplated by the Act violates the uniformity clause of the Illinois Constitution. Under the terms of the Act, once an ordinance is passed by a municipality authorizing tax increment allocation financing, then the *ad valorem* taxes, if any, arising from the levies upon taxable real property in the project area by the taxing districts will be paid to the county treasurer. "That portion, if any, of such taxes which is attributable to the increase" in real property values over and above the last real property valuation prior to passage of the ordinance is withdrawn from the revenues of each taxing

district in the project area and paid to the municipal treasurer for deposit in a special tax allocation fund. (Ill. Rev. Stat. 1977, ch. 24, par. 11—74.4—8.) Thus, before any monies are ever paid to any of the various taxing districts, the county clerk is required to deduct a portion of the revenues and send it to the municipal treasurer to retire the costs and obligations incurred by the municipality in redeveloping an area within that municipality. In my opinion the Act authorizes an invasion of the fiscal integrity of the various taxing districts and is in direct conflict with the opinions of this court which hold that "[t]he prohibition of the constitution is that one municipality may not force another to levy taxes to pay a debt which it did not incur or for the corporate purpose of the other municipality." (*Board of Library Directors v. City of Lake Forest* (1959), 17 Ill. 2d 277, 286; *Flynn v. Kucharski* (1970), 45 Ill. 2d 211, 219.) Even assuming, *arguendo,* that since the elimination of urban blight serves a public purpose of the State, it need not serve a corporate purpose of *each* taxing district, it cannot be denied that the various taxing districts are required to levy taxes to pay debts they did not incur.

A taxing statute enjoys a strong presumption of validity (*Williams v. City of Chicago* (1977), 66 Ill. 2d 423, 432-33), and one attacking it must negate every conceivable basis which might support it (*Lehnhausen v. Lake Shore Auto Parts Co.* (1973), 410 U.S. 356, 364, 35 L. Ed. 2d 351, 358, 93 S. Ct. 1001, 1006). Still in all, there are limits to the taxing power, which limits the judiciary must enforce. A scheme of taxation which permits the compulsory diversion of taxes levied and collected by one municipality to another municipality is constitutionally infirm. (*Flynn v. Kucharski* (1970), 45 Ill. 2d 211, 219-20.) In *Flynn v. Kucharski* the act in question permitted taxpayers in Cook County to pay their real property taxes directly to their township col-

lector rather than the county collector. The township collector could retain 2% of the revenues collected as a fee before remitting the remainder to the county collector. The result, it was held, was that the uniformity clause of the Illinois Constitution was violated (Ill. Const. 1870, art. IX, secs. 9, 10; Ill. Const. 1970, art. IX, sec. 4) because a portion of the taxes paid by the taxpayers of Cook County was being diverted to the township for the benefit of the township's taxpayers. That decision was based on the ground that taxes of the county taxpayers were diverted to the use of the specialized corporate purposes of the townships. My disagreement with the majority opinion stems from the fact that the Act permits a tax to be levied and collected by one unit of government which inures to the benefit of another unit of government. The effect of such revenue diversion is that the taxing districts lose revenue which, while perhaps caused by the redevelopment project, was still levied and collected under the aegis of, and presumably for the exclusive use of, the particular taxing districts. There is no rational basis why an increase in revenue of a taxing district, regardless of the cause for it, should be commandeered and given to another taxing district. The lack of a rational basis becomes even clearer when it is realized that revenues of a large taxing district, such as a county, covering territory far in excess of the municipal boundaries, must be turned over to the municipal treasurer to pay for the elimination of blight within a city. Thus revenue raised for use by the entire county, albeit as a result of urban redevelopment, is not permitted to be used by the county but *must* be paid to reduce the debt of the municipality. The taxpayers in the county are therefore being taxed in order to pay the debts of the municipality. This results in "a diversion, in the process of collection, and as part of the statutory machinery of collection, of taxes paid by the taxpayers of one governmental unit for the benefit

of the taxpayers of another governmental unit." (*Flynn v. Kucharski* (1970), 45 Ill. 2d 211, 219.) The Act thereby offends the uniformity provision of article IX, section 4(a), of the 1970 Constitution.

Finally, it is argued by the city that the sharing of revenue among units of government is expressly authorized by the 1970 Illinois Constitution, article VII, section 10(a). That section provides:

"SECTION 10. INTERGOVERNMENTAL COOPERATION

(a) Units of local government and school districts may contract or otherwise associate among themselves, with the State, with other states and their units of local government and school districts, and with the United States to obtain or share services and to exercise, combine, or transfer any power or function, in any manner not prohibited by law or by ordinance. Units of local government and school districts may contract and otherwise associate with individuals, associations, and corporations in any manner not prohibited by law or by ordinance. Participating units of government may use their credit, revenues, and other resources to pay costs and to service debt related to intergovernmental activities."

While this constitutional provision permits revenue sharing among governmental units, that function is quite separate from what is embraced under the act in question here. There is a fundamental difference between the levying and collection of tax revenues by one district for the use of another taxing district, which is involved here, and the voluntary distribution or expenditure of tax revenues, as is contemplated by the constitutional provision authorizing an intergovernmental project designed for the mutual benefit of all units participating. The type of revenue sharing envisioned by the drafters of the Constitution is described in the official explanation of section 10:

"This section is new. It permits government at all levels to cooperate in working out common problems. Thus, one local government can contract with another

government or private parties to share services and divide the costs equitably." (7 Record of Proceedings, Sixth Illinois Constitutional Convention 2730, cited in Anderson & Lousin, *From Bone Gap to Chicago: A History of the Local Government Article of the 1970 Illinois Constitution,* 9 J. Mar. J. Prac. & Proc. 698, 794 (1976).)

The sharing of revenue between the State and local governmental units has been approvingly referred to by this court in the past (*Goldstein v. Rosewell* (1976), 65 Ill. 2d 325, 329), and I know of no reason to assume a different position toward revenue sharing of units of local government *inter se.* It is quite another matter, however, for the tax revenues generated within one taxing district to be compulsorily diverted to another taxing district, without the consent of the taxpayers in the first taxing district. While my disagreement with the majority opinion is limited to the ground that the Act violates the uniformity clause, as did the act in *Flynn v. Kucharski,* I note that this legislation also raises serious questions as to the deprivation of the due process and equal protection rights of the taxpayers in the various taxing districts. See Comment, *The Constitutionality of the Exercise of Extraterritorial Powers By Municipalities,* 45 U. Chi. L. Rev. 151 (1977).

MR. JUSTICE MORAN joins in this dissent.