Opinion by JUDGE J. JONES
¶ 1 A homeowners association, Landmark Towers Association, Inc. (Landmark), filed suit challenging the creation of a special district that includes condominiums owned by Landmark members. In a nutshell, Landmark asserts that the special district can't levy Landmark owners' properties to pay for *1143 bonds issued by the special district, which funded improvements on other property, because the election organizing the special district, approving the bonds, and approving the levies paying for the bonds violated article X, section 20 of the Colorado Constitution (otherwise known as the Taxpayer's Bill of Rights (TABOR) ), and the Landmark owners' rights to due process. Though the district court found against Landmark on the TABOR election claim, it found for Landmark on its due process claim, as well as on other claims, enjoined the special district from trying to collect levies from the Landmark owners, and ordered refunds. On appeal, we ruled, as now relevant, that Landmark should prevail on its TABOR election claim, but didn't address other contentions. Landmark Towers Ass'n v. UMB Bank, N.A. , 2016 COA 61, 436 P.3d 1126 ( Landmark I ).
¶ 2 The Colorado Supreme Court remanded the case to us after reversing our conclusion that the election giving rise to the parties' dispute violated TABOR. UMB Bank, N.A. v. Landmark Towers Ass'n , 2017 CO 107, 408 P.3d 836 ( Landmark II ). Though the supreme court had granted certiorari review on a number of issues, it ultimately resolved only one-whether the time bar of section 1-11-213(4), C.R.S. 2017, precludes Landmark's TABOR challenge to the election.
¶ 3 We asked the parties to submit supplemental briefs identifying the issues that remain for us to decide and explaining how, if at all, the supreme court's decision impacts those issues. Having considered those supplemental briefs and the parties' briefs previously filed, we essentially affirm the district court on all remaining issues save one. The net result is that we uphold the district court's rulings that the election was illegal, Landmark is entitled to injunctive relief barring the special district from levying against the Landmark owners' properties, the mill levy rate of the district's levy exceeds that allowed by law, and the Landmark owners are entitled to a refund of excessive assessments; but we reverse the district court's ruling that the Landmark owners are entitled to a "refund" of misappropriated bond sale proceeds.
I. Background
¶ 4 We recited the relevant facts of the case at some length in Landmark I , but given the nature of the issues now before us, we do so again, adding facts particularly relevant to our analysis of those issues. We glean these facts from the district court's extensive findings following a trial to the court and the exhibits submitted by the parties.
¶ 5 Beginning in 2005, Zachary Davidson developed two high-rise condominium towers (the Landmark Project) via an entity he controlled named 7677 East Barry Avenue Associates, L.P. Davidson built the public infrastructure for the 3.5-acre Landmark Project pursuant to a "Developer Improvement Agreement" with Greenwood Village.
¶ 6 Before the Landmark Project was complete, Davidson also decided to develop a separate residential community (the European Village Project) on 11.4 acres of nearby land owned by Everest Marin, L.L.P. (Everest), another entity that he controlled. But he discovered that the revenue base for the European Village Project wouldn't be sufficient to pay the general obligation bonds he intended to issue to fund construction of its necessary infrastructure-streets, sidewalks, curbs and gutters, water lines, sanitation lines, and landscaping. So he embarked on a scheme to use owners of condominiums in the Landmark Project to pay for those improvements, even though none of the improvements would be on Landmark Project property and the Landmark Project's own infrastructure was being built pursuant to a separate financing arrangement. To do this, he created a special district comprising both projects, known as the Marin Metropolitan District (District).
¶ 7 As required by statute, Davidson applied with Greenwood Village for approval of the District. He submitted a "Service Plan" describing the District and explaining how the proposed improvements would be paid for, among other things. See § 32-1-202, C.R.S. 2017. But neither he nor anyone else told those who had entered into Landmark Project purchase agreements about the application *1144 or about the Landmark Project's inclusion in the District.[1]
¶ 8 The Service Plan doesn't show any area of the Landmark Project that would benefit from the proposed improvements: to the contrary, the maps included in the Service Plan show that all improvements are separated from the Landmark Project by existing streets. And more, the infrastructure is internal to the European Village Project: it provides no benefit, such as improved or alternative traffic routes, to the surrounding community.
¶ 9 Not surprisingly, Greenwood Village's planning staff criticized the Service Plan for including the Landmark Project. At a city council meeting in August 2007, Davidson, one of his associates, and his attorney responded to that criticism by telling the city council that the Landmark Project would benefit from the new infrastructure, the Landmark Project buyers had been told of the proposed District and the associated high tax burdens, and those buyers favored the proposal. All of those statements were false. Apparently based at least in part on those false assurances, the city council approved the Service Plan.
¶ 10 Davidson's next step was to hold an election to organize the District, approve the bonds, and approve the "taxes" paying the bonds. After obtaining court approval to hold the election, see § 32-1-301, C.R.S. 2017, in November 2007, Davidson and five of his associates (and only those six individuals) voted in the election to organize the District, approve the bonds, and approve the levies. This "election" was planned and conducted using what could be charitably described as dubious means. See Landmark I , ¶¶ 10, 54-55, 57, 63. The six voters purported to become electors by entering into what we previously concluded were sham purchase contracts with Everest. Id. at ¶¶ 61-64. And the organizers didn't give the Landmark Project buyers any notice of the election, so none of them voted.
¶ 11 The District later sold $30,485,000 in "Limited Tax General Obligation Bonds" to Colorado Bondshares (Bondshares) in June 2008. The bonds call for payment of interest at an annual rate of 7.75%, and have a twenty-year maturity date (rather than the thirty-year maturity date called for by the Service Plan). At maturity, the bonds require a balloon payment of over $23 million. And, as discussed below, although the Service Plan capped the debt service levy for the bonds at 49.5 mills (absent prior approval by the city), the District imposed a levy of 59.5 mills.[2]
¶ 12 UMB Bank, N.A. (UMB) held the bond sale proceeds in trust. Davidson, purporting to act on behalf of the District, drew on those funds, but allegedly misappropriated millions of dollars for his personal use. See Landmark II , ¶ 15 ; Landmark I , ¶ 12.[3] In the end, Everest didn't build any of the promised European Village Project infrastructure.
¶ 13 The Landmark owners learned of the District's creation, and of their properties' inclusion in the District, when they began receiving tax bills. Their investigation disclosed that the District had been formed and approved by means of fraud perpetrated on the city, Landmark Project buyers, the court, and perhaps others. Landmark then sued UMB, Bondshares, and the District (collectively, defendants).
¶ 14 As now relevant, the district court ultimately ruled in Landmark's favor on a variety of claims. These claims included that the election and resulting levying of Landmark owners' properties violated the owners' constitutional rights to due process; the District improperly disbursed bond sale proceeds for Davidson's personal benefit; and the District's mill levy on the Landmark owners' properties was higher than that allowed by statute or by the Service Plan. But the court rejected Landmark's claim that because ineligible voters (Davidson and his *1145 five associates) had voted in the organization, bond, and tax election, while eligible voters (the Landmark Project buyers) hadn't been given notice of the election, the election violated TABOR. See Landmark I , ¶¶ 15-16. The court ordered the District to refund the misused bond funds, ordered the District to refund the sums collected from Landmark owners in excess of the Service Plan's mill levy limit, and enjoined the District from levying on the Landmark owners' properties.
¶ 15 Both sides appealed. We reversed the district court's ruling that the election hadn't violated TABOR, without addressing defendants' challenges to the district court's judgment. Id. at ¶¶ 59-70. The supreme court granted certiorari review on several issues, but, as noted above, ultimately resolved only one: the court held that Landmark's TABOR challenge to the election was time barred by section 1-11-213(4). So the court reversed our previous decision and remanded the case to us to resolve outstanding issues.
¶ 16 Having considered the parties' supplemental briefs as well as the briefs originally filed in this court, we conclude that we need to address the following contentions, all of which are asserted by defendants, and none of which are impacted by the supreme court's decision:
1. The district court erred in finding that including the Landmark Project in the District violated the Landmark owners' rights to due process.
2. The district court erred in weighing the equities in imposing the injunction.
3. The injunction violates the Uniform Tax Clause of the Colorado Constitution.
4. The district court erred in ruling that the District may not levy property taxes in excess of fifty mills.
5. The district court erred in ruling that the misappropriation of bond sale proceeds violated TABOR and in ordering a refund of those proceeds.
¶ 17 Addressing these contentions in this order, we reject the first four, but agree with the fifth.
II. Discussion
A. Due Process Violation
¶ 18 The district court gave two reasons for concluding that the Landmark owners' rights to due process were violated by the manner in which the District was created and the associated levies were approved: (1) the inclusion of the Landmark Project in the District solely to provide a sufficient revenue base to fund European Village Project improvements was a taking of property without due process; and (2) the levy is in substance a special assessment, not a tax, that doesn't provide any special benefit to the Landmark Project.
¶ 19 Defendants argue first that the due process claim is barred by a thirty-day statute of limitations, section 11-57-212, C.R.S. 2017. They argue second that there was no due process violation because the levy was a tax, and property subject to a tax needn't receive any benefit in return for the tax payments. Both arguments fail.
1. Statute of Limitations
¶ 20 Section 11-57-212 provides as follows:
No legal or equitable action brought with respect to any legislative acts or proceedings in connection with the authorization or issuance of securities by a public entity shall be commenced more than thirty days after the authorization of such securities.
¶ 21 In Landmark I , we held, as now relevant, that defendants waived the affirmative defense provided by the statute by failing to raise it at trial, and that the statute was equitably tolled by virtue of the District organizers' successful, intentional efforts to keep the Landmark Project buyers in the dark about the creation of the District and the election. Landmark I , ¶¶ 21-25, 51-55 & n.4. We see no reason to retreat from those holdings.
¶ 22 In any event, the argument fails on the merits. The statute applies, by its terms, to "the authorization or issuance of securities." § 11-57-212. Landmark, however, challenges, on constitutional grounds, the creation of the District to include the Landmark Project and the associated levies. We won't expand the reach of the statute beyond the *1146 plain meaning of its language. See Denver Post Corp. v. Ritter , 255 P.3d 1083, 1089 (Colo. 2011) (if statutory language is clear, we apply the statute as written); Spahmer v. Gullette , 113 P.3d 158, 162 (Colo. 2005) ("We will not create an addition to a statute that the plain language does not suggest or demand.").
2. The Merits
a. Taking Without Due Process: Myles Salt
¶ 23 This issue is controlled by a United States Supreme Court decision, Myles Salt Co. v. Board of Commissioners of the Iberia & St. Mary Drainage District , 239 U.S. 478, 36 S.Ct. 204, 60 L.Ed. 392 (1916). Two adjoining parishes created a drainage district comprising land in both. To pay for construction costs, the district levied a five-mill "ad valorem tax" on all property in the district. Myles Salt sued, claiming that the land in one of the parishes, including its land, wouldn't benefit from the district and that this land had been included in the district solely to help fund construction benefiting land in the other parish. Id. at 480, 36 S.Ct. 204.
¶ 24 The Supreme Court held that the formation of the district to include Myles Salt's land was "an act of confiscation" violating Myles Salt's right to due process. Id. at 485, 36 S.Ct. 204. It reasoned that, although creation of the particular type of district at issue was otherwise authorized by law, the reason for including certain property-to derive revenues for a project solely benefiting other property-was constitutionally impermissible. Id. at 483-85, 36 S.Ct. 204 ; see id. at 485, 36 S.Ct. 204 ("It is to be remembered that a drainage district has the special purpose of the improvement of particular property, and when it is so formed to include property which is not and cannot be benefited directly or indirectly, including it only that it may pay for the benefit to other property, there is an abuse of power and an act of confiscation.") (emphasis added).[4]
¶ 25 Likewise in this case, the District's organizers included the Landmark Project in the District only to use it as a source of payment for improvements to other property-specifically, the European Village Project. And, as the district court found, with record support, the Landmark Project receives no benefit, direct or indirect, from those improvements. See Genrich v. City of Rice Lake , 268 Wis.2d 233, 673 N.W.2d 361, 365 (Wis. Ct. App. 2003) (question whether improvements benefit the general public or are of merely local benefit is one of fact); 14 Eugene McQuillin, The Law of Municipal Corporations § 38:15, at 116, § 38:44, at 224 (3d ed., rev. vol. 2008) (same; citing cases). Defendants don't challenge this finding.
¶ 26 Defendants' attempt to distinguish Myles Salt falls well short. They argue that although Myles Salt said the levy at issue in that case was an ad valorem tax, it wasn't really such a tax but was instead a "special assessment," and federal and Colorado courts alike have held that an ad valorem tax needn't benefit particular property to be lawfully levied against such property. See, e.g. , Nashville, Chattanooga & St. Louis Ry. v. Walters , 294 U.S. 405, 429-30, 55 S.Ct. 486, 79 L.Ed. 949 (1935) ; St. Louis & Sw. Ry. Co. v. Nattin , 277 U.S. 157, 159, 48 S.Ct. 438, 72 L.Ed. 830 (1928) ; Bloom v. City of Fort Collins , 784 P.2d 304, 307-08 (Colo. 1989).
¶ 27 But defendants miss the point of Myles Salt . The Court's decision didn't turn on the nature of the levy (tax versus special assessment); the holding turned on the organizers' reason for including particular property in the district in the first place. Because that reason was to raise revenue to fund a project solely benefiting other property, the inclusion of the property receiving no benefit was confiscatory-a "plain abuse of power." 239 U.S. at 481, 484-85, 36 S.Ct. 204. Indeed, that is how courts, including the Supreme Court itself, understand the holding in Myles Salt ; they distinguish the situation in that case from the common situation where the government imposes a general purpose tax *1147 on residents or property within an existing political subdivision or unit. See, e.g. , Valley Farms Co. of Yonkers v. Westchester County , 261 U.S. 155, 162-63, 43 S.Ct. 261, 67 L.Ed. 585 (1923) (distinguishing Myles Salt and similar Supreme Court cases on this basis); People ex rel. Averna v. City of Palm Springs , 51 Cal.2d 38, 331 P.2d 4, 9-10 (1958) ; People ex rel. Hanrahan v. Caliendo , 50 Ill.2d 72, 277 N.E.2d 319, 323-24 (1971) ; S. W. Prop. Tr., Inc. v. Dallas Cty. Flood Control Dist. No. 1 , 136 S.W.3d 1, 7-8 (Tex. App. 2001) (In Myles Salt , "the Court focused not on the lack of actual benefit to the plaintiff's property, but rather on the improper motives behind the inclusion of the property in the district."); see also DeVilbiss v. Matanuska-Susitna Borough , 356 P.3d 290, 293, 296-99 (Alaska 2015) (addressing a challenge to a tax where there was no issue concerning inclusion of the taxed property); Griffin v. Anne Arundel County , 25 Md.App. 115, 333 A.2d 612, 620-21 (1975) (addressing a challenge to a general purpose property tax).
¶ 28 The facts of this case can't be distinguished from those in Myles Salt in any principled way. So we conclude that the formation of the District to include the Landmark Project, and the resulting levying of the Landmark owners' properties, violated the Landmark owners' rights to due process.
b. No Special Benefit
¶ 29 As the district court also concluded, even aside from Myles Salt , Colorado law makes clear that imposing a special assessment on property that doesn't specially benefit from the funded improvements violates those property owners' rights to due process. Reams v. City of Grand Junction , 676 P.2d 1189, 1194-95 (Colo. 1984) ; Ochs v. Town of Hot Sulphur Springs , 158 Colo. 456, 461-62, 407 P.2d 677, 680 (1965) ; City & Cty. of Denver v. Greenspoon , 140 Colo. 402, 406, 344 P.2d 679, 681 (1959), disapproved of on other grounds by Manuel v. Fort Collins Newspapers, Inc. , 631 P.2d 1114 (Colo. 1981) ; see also Dutoit v. Bd. of Cty. Comm'rs , 233 Kan. 995, 667 P.2d 879, 888 (1983) (creation of a sewer district); 14 McQuillin, § 38:58, at 278 (property that doesn't specially benefit from improvements funded by a special assessment can't be included in the improvement district). And the district court found that the so-called tax is, in substance, a special assessment because it doesn't "defray the general expenses of government" but instead funds a private venture's desired infrastructure. Because the Landmark owners' properties don't receive any special benefit from the improvements, the District's imposition violates their rights to due process.
¶ 30 In arguing that the levy isn't a special assessment, defendants rely on the fact the levy is ad valorem in form-that is, imposed on real property according to a uniform mill rate.[5] But defendants overlook the purpose and characteristics of the levy. See City of Littleton v. State , 855 P.2d 448, 453 (Colo. 1993) (whether a levy is a tax, an assessment, or a fee depends on its functional characteristics); Bloom , 784 P.2d at 307-08 (the nature of a levy is determined according to its function and purpose); see also 14 McQuillin, § 38:1, at 30 (the characteristics of the levy, not its label, determine whether it's a special assessment; citing cases).
¶ 31 A true ad valorem tax is one that "provide[s] revenues in order to defray the general expenses of government as distinguished from the expense of a specific function or service." Bloom , 784 P.2d at 307 ; see also Morton Salt Co. v. City of South Hutchinson , 177 F.2d 889, 891-92 (10th Cir. 1949) ("[T]here is a valid distinction between a special tax or assessment to finance special improvements designed to benefit property or persons located within a particular taxing district, and an ad valorem tax on all the property within the taxing jurisdiction for the general welfare of the whole community."); Colo. Union of Taxpayers Found. v. City of Aspen , 2018 CO 36, ¶¶ 3, 20, 418 P.3d 506 (defining "taxes"); Zelinger v. City & Cty. of Denver , 724 P.2d 1356, 1358 (Colo. 1986) ; Ochs , 158 Colo. at 460-61, 407 P.2d at 679-80 ; 14 McQuillin, § 38:1, at 12-13, 19-20, § 38:15, at 115. Put another way, a tax funds such public uses as "schools, the support of the poor, ... police and fire protection, ...
*1148 health and sanitation, ... waterworks and the like." Morton Salt Co. , 177 F.2d at 892. Special assessments, in contrast, fund local improvements that benefit particular property. Bloom , 784 P.2d at 308 ; Zelinger , 724 P.2d at 1358 ; Ochs , 158 Colo. at 460, 407 P.2d at 679 ; see Colo. Union of Taxpayers Found. , ¶ 24 (discussing Bloom and Zelinger , among other cases); San Marcos Water Dist. v. San Marcos Unified Sch. Dist. , 42 Cal.3d 154, 228 Cal.Rptr. 47, 720 P.2d 935, 939 (1986) (ad valorem taxes fund general expenditures such as fire and police protection, fire stations, police stations, and public buildings, whereas special assessments fund local improvements directly benefiting particular real property, such as street improvements, street lighting, irrigation, sewer connection, drainage, and flood control), superseded by statute on other grounds , Cal. Gov't Code §§ 54999 - 54999.7 (West 2017), as recognized in City of Marina v. Bd. of Trs. of Cal. State Univ. , 39 Cal.4th 341, 46 Cal.Rptr.3d 355, 138 P.3d 692 (2006) ; 14 McQuillin, § 38:1, at 12-13, 19-20.
¶ 32 True, not all improvements are "local"; some are general. And if general, imposition of a tax to pay for them is permissible, within constitutional and statutory limits. The distinction has been articulated as follows:
A general improvement is one that confers a general benefit, that is, a "substantially equal benefit and advantage" to the property of the whole community, or benefits the public at large. In contrast, a local improvement, although incidentally beneficial to the public at large, is primarily made for the accommodation and convenience of inhabitants in a particular locality and confers "special benefits" to their properties.
Genrich , 673 N.W.2d at 364 (quoting Duncan Dev. Corp. v. Crestview Sanitary Dist. , 22 Wis.2d 258, 125 N.W.2d 617, 619-20 (1964) ); see Knox v. City of Orland , 4 Cal.4th 132, 14 Cal.Rptr.2d 159, 841 P.2d 144, 149-50 (1992), superseded by constitutional amendment on other grounds , Cal. Const. art. XIIIC, § 2, as recognized in Jacks v. City of Santa Barbara , 3 Cal.5th 248, 219 Cal.Rptr.3d 859, 397 P.3d 210 (2017) ; 14 McQuillin, § 38:15, at 115.
¶ 33 The levy at issue in this case funds purely local improvements directly and specially benefiting only the European Village Project.[6] It does not fund "the general expenses of government." Bloom , 784 P.2d at 307.[7] It is therefore a special assessment, not a tax. And so the district court didn't err in ruling on this basis, too, that the levy violates the Landmark owners' rights to due process.
B. The Injunction
¶ 34 Defendants assail the district court's injunction barring the District from levying against the Landmark owners' properties on two additional fronts. First, they contend that the court erred in balancing the equities. Second, they say the injunction violates article X, section 3 of the Colorado Constitution, requiring uniform taxation of property. Neither attack proves successful.
1. The District Court's Order
¶ 35 The district court took a belt and suspenders approach in rejecting defendants'
*1149 opposition to an injunction barring the assessments. Initially, it ruled that such an injunction is required by law where property is unconstitutionally included within a special district and levied against, and so no weighing of the equities is required or appropriate. It then ruled that even if a weighing of the equities is required, in a contest between the equities favoring the Landmark owners and those favoring Bondshares (the only defendant claiming that the equities favor its position), the Landmark owners prevail.
2. Standard of Review
¶ 36 Defendants' challenges to the injunction raise two issues of law-whether the district court properly ruled that the law requires an injunction in these circumstances, and whether the injunction violates the Colorado Constitution's uniform taxation requirement. We consider such issues de novo. See Coloradans for a Better Future v. Campaign Integrity Watchdog , 2018 CO 6, ¶ 15, 409 P.3d 350 (appellate court reviews questions of constitutional interpretation de novo); In re Marriage of Cardona , 2014 CO 3, ¶ 9, 316 P.3d 626 (appellate court reviews purely legal issues de novo); Evans v. Romer , 854 P.2d 1270, 1275 (Colo. 1993) (appellate court reviews de novo whether an injunction violates a constitutional right).
¶ 37 The district court's weighing of the equities, however, was a matter of discretion. See Wal-Mart Stores, Inc. v. United Food & Commercial Workers Int'l Union , 2016 COA 72, ¶ 24, 382 P.3d 1249. We review such a decision for an abuse of that discretion, meaning that we'll overturn it only if it was manifestly arbitrary, unreasonable, or unfair, or based on a misapplication of the law. Id. ; Stulp v. Schuman , 2012 COA 144, ¶¶ 9, 10, 410 P.3d 457. At the same time, we defer to the court's factual findings underlying its decision if they have record support. Stulp , ¶ 9.
3. The Merits
a. Weighing the Equities
¶ 38 The law is that if a taxing authority assesses property in violation of a property owner's right to due process, the assessment is void and can't be continued; to enforce the assessment would itself violate the owner's right to due process. E.g. , Greenspoon , 140 Colo. at 405-07, 344 P.2d at 681-82 ; Cook v. City & Cty. of Denver , 128 Colo. 578, 265 P.2d 700 (1954) ; Pomroy v. Bd. of Pub. Waterworks , 55 Colo. 476, 136 P. 78 (1913). Where, as in this case, the law imposes a particular remedy for a particular wrong, considerations of equity can't be applied to deprive the injured party of that remedy. This is what is meant by the phrase "equity follows the law." Armstrong v. Driscoll Constr. Co. , 107 Colo. 218, 222, 110 P.2d 651, 653 (1941) ; Am. Nat'l Bank of Denver v. Tina Marie Homes, Inc. , 28 Colo. App. 477, 485, 476 P.2d 573, 577 (1970). The district court correctly applied this maxim, and defendants scarcely attempt to show otherwise.[8]
¶ 39 But, like the district court, leaving nothing to chance, we also conclude that the district court didn't abuse its discretion in balancing the equities. On this score, defendants say only that if Landmark Project property can't be levied, Bondshares, which did nothing wrong, will "suffer millions of dollars in losses." Maybe, but the flip side is undoubtedly true: if the levy is allowed, the Landmark owners-who did nothing wrong, were actively defrauded, and suffered violations of their rights to due process-will, collectively, lose millions of dollars. And that isn't all the Landmark owners have going for them. The district court also noted a number of other facts weighing against Bondshares:
• Bondshares, a sophisticated institutional investor with a great deal of experience in this area, "had full opportunity to evaluate the viability of Mr. Davidson and his entities which were the moving forces behind the Marin district."
*1150 • Bondshares was concerned about the risks of the project from the outset.
• If Bondshares had more carefully looked at the Service Plan, it would've seen that it was "questionable" whether the Landmark Project would receive any actual benefit.
• Bondshares should've seen that "virtually no controls were in place regarding the requests for payment by Marin and specifically that there was no process for verification of the accuracy or validity of the claims for payment made."
¶ 40 Again, defendants don't challenge any of these findings. And to them we add the following undisputed facts:
• Defendants don't even assert that the equities favor the District (the entity imposing the levy), and any such assertion would be meritless.
• Bondshares knew that Davidson was exerting pressure to gain free use of the bond proceeds, but simply left it up to UMB, the trustee, to deal with that pressure.
• Bondshares believed that the financing plan in the Service Plan wasn't feasible, and purchased the bonds on terms differing substantially from those called for by the Service Plan.
• Bondshares knew that, absent some "magical ability" to collect the $23.8 million balloon payment at the end of the bonds' term, that payment wouldn't be made and the bonds would have to be refinanced.[9]
¶ 41 All of this paints a picture of a sophisticated institutional investor with some knowledge of both the risk and the lack of benefit to the Landmark Project, and the means and incentive to obtain more. The Landmark owners, in contrast, were deliberately kept in the dark about the creation of the District and blindsided by the so-called taxes. Under these circumstances, any decision by the district court that the equities favor Bondshares would've been an abuse of discretion.
b. The Uniform Tax Clause
¶ 42 Article X, section 3 of the Colorado Constitution provides, as relevant in this case, that "[e]ach property tax levy shall be uniform upon all real and personal property not exempt from taxation under this article located within the territorial limits of the authority levying the tax." Colo. Const. art. X, § 3 (1)(a). It "requires that the burden of taxation be uniform on the same class of property within" the taxing authority's jurisdiction. Denver Urban Renewal Auth. v. Byrne , 618 P.2d 1374, 1386 (Colo. 1980).
¶ 43 Defendants argue that enjoining the District from levying on the Landmark owners' properties violates this requirement because it means that only some of the property in the District-that in the European Village Project-can be taxed.
¶ 44 The district court rejected this argument first because defendants didn't raise it until after the trial. But it went on to reject it for two additional reasons: the requirement doesn't apply to special assessments such as that imposed by the District, and the injunction doesn't obligate the District to do anything with respect to other persons or property outside the Landmark Project. The district court ruled correctly in all three respects.
¶ 45 First, it's undisputed that defendants raised this issue for the first time in their motion for reconsideration. That was too late. See Hice v. Lott , 223 P.3d 139, 149 (Colo. App. 2009) ; Bowlen v. Fed. Deposit Ins. Corp. , 815 P.2d 1013, 1015-16 (Colo. App. 1991) ; see also People v. Schaufele , 2014 CO 43, ¶ 49, 325 P.3d 1060 (Boatright, J., concurring) ("Motions for reconsideration are designed to correct erroneous court rulings; they are not designed to allow parties to present new legal arguments for the first time and then appeal their denial....").[10]
*1151 ¶ 46 Arguing to the contrary, defendants say that the issue didn't arise until after the court imposed the injunction following trial. Not so. Landmark sought injunctive relief from the beginning of the case, including an injunction enjoining the District from levying against the Landmark owners' properties. And the Landmark owners always sought a refund of all amounts paid to the District. If that weren't enough to put defendants on notice that the Landmark owners were asserting that the District couldn't levy against their properties, the Landmark owners also asserted, before trial, that any levy against their properties was invalid because their properties receive no benefit from the creation of the District or the construction of the improvements. It was incumbent on defendants to raise any defense to these claims before and during trial.
¶ 47 Second, the law is, and defendants don't dispute, that article X, section 3 doesn't apply to special assessments; it applies only to taxes. Zelinger , 724 P.2d at 1358 ; City of Denver v. Knowles , 17 Colo. 204, 207-11, 30 P. 1041, 1042-44 (1892). As discussed above, the District's levies against the Landmark owners' properties are special assessments, not taxes.
¶ 48 And third, the injunction doesn't require the District to impose taxes on anyone or on any property. If the District decides to impose a true tax, it can exclude the Landmark Project from the District under section 32-1-501, C.R.S. 2017.[11]
¶ 49 To these three reasons for rejecting defendants' argument, as given by the district court, we add a fourth-the violation of the Landmark owners' rights to due process under both the Federal and Colorado Constitutions entitles them to the injunctive relief they request, as a matter of law. E.g. , Greenspoon , 140 Colo. at 405-07, 344 P.2d at 681-82. We don't think that article X, section 3 can be read to require what due process forbids.[12]
C. The Excessive Mill Rate
¶ 50 The District's bonds don't call for the debt to be paid for by any particular mill levy. But the District imposed a levy of 59.5 mills on all real property within the District to service the debt. Landmark claimed that this was at least 9.5 mills more than that allowed by section 32-1-1101(6)(b), C.R.S. 2017, and the Service Plan.
¶ 51 The district court found in Landmark's favor on this claim, reasoning that (1) section 32-1-1101(6)(b) caps the mill levy rate for the bonds at fifty mills and (2) the Service Plan similarly caps the mill levy rate at fifty mills. As to the latter, the court concluded that such a cap is contained in both section VIII.D of the Service Plan and the "pro forma" financing plan attached thereto and incorporated therein. As a remedy, the court ordered the District to come up with a refund plan.
¶ 52 Defendants argue on appeal that (1) the district court failed to read subsections (6)(a) and (6)(b) of section 32-1-1101 together, and those provisions create an exception to the fifty-mill limit when bonds are purchased by an institutional investor (such as Bondshares); and (2) sections VIII.D and VIII.E of the Service Plan essentially track section 32-1-1101(6)(a) and (b). Put a bit more simply, defendants argue that the 59.5 mill levy comports with both section 32-1-1101(6) and the Service Plan.
¶ 53 Defendants' argument has some merit, but only up to a point. Landmark agrees that the district court's reading of section 32-1-1101(6) was incorrect-that is, if the institutional *1152 investor exception of section 32-1-1101(6)(a)(IV) applies, the mill levy rate may exceed fifty mills, so long as such a levy isn't inconsistent with the service plan . We needn't address that particular issue, however, because we conclude that the district court correctly found that the Service Plan doesn't permit a levy of 59.5 mills.
¶ 54 For their part, defendants concede, as they must, that even if a special district's mill levy complies with section 32-1-1101(6), it also must comply with the applicable service plan. See § 32-1-207(1), C.R.S. 2017 (a "special district shall conform so far as practicable to the approved service plan"); Plains Metro. Dist. v. Ken-Caryl Ranch Metro. Dist. , 250 P.3d 697, 700 (Colo. App. 2010) (the Special District Act requires special districts to conform to their service plans). They nonetheless argue that the mill levy complies with sections VIII.D and VIII.E of the Service Plan. But even if that's so, it doesn't get them where they want to go because the mill levy doesn't conform to the financing plan.[13]
¶ 55 Section VIII.A of the Service Plan says that the financing plan estimates revenue for paying debt on the bonds, "including amounts available ... from the debt service mill levy." Though defendants dismiss the financing plan as merely tentative and of no import, the text of the Service Plan indicates that it was intended to have binding effect. For example, it says that "[a]ny bond financing plan that generally conforms with or improves the pro forma model of the Financing Plan ... will require no further action or approval of the City." This statement implies that any bond financing plan that wouldn't generally conform with or improve the financing plan would require city approval.
¶ 56 The financing plan called for a debt service mill levy of no more than 49.5 mills. The district court found that the 59.5-mill-rate levy that the District imposed "is a substantial and significant variance from the pro forma model materially affecting" the Landmark owners (and anyone else required to pay it). Defendants don't challenge that factual finding. See M.D.C./Wood, Inc. v. Mortimer , 866 P.2d 1380, 1384 (Colo. 1994) (appellate court reviews trial court's factual findings for clear error); Page v. Clark , 197 Colo. 306, 313, 592 P.2d 792, 796 (1979) (same). And it's undisputed that the District didn't obtain Greenwood Village's approval to impose the 59.5-mill-rate levy. It necessarily follows that the District violated the Service Plan, and it then follows that the 59.5-mill-rate levy is illegal.[14]
D. Misappropriation of Bond Sale Proceeds
¶ 57 Landmark claims that Davidson misappropriated millions of dollars of the proceeds from the District's sale of the bonds to Bondshares. The Landmark owners seek "refunds" of the misappropriated sum under TABOR, specifically clause (1). The district court found that although Landmark had made a "compelling showing" that Davidson had misappropriated almost $5 million of the bond sale proceeds, it had proved misappropriation of only $384,611. The court also found that this misuse of funds violated TABOR, and it ordered refunds.
¶ 58 Defendants argue that the bond proceeds aren't "revenue" within the scope of clause (1), and so the Landmark owners aren't entitled to refunds under that provision. We agree with defendants on this point. And we disagree with Landmark's alternative position that even if refunds aren't proper under TABOR, they are proper under the "anti-donation" provisions of the Colorado Constitution, article XI, sections 1 and 2.
¶ 59 Clause (1) of TABOR says, as relevant to the issue before us, that "[r]evenue collected, kept, or spent illegally since four full fiscal years before a suit is filed shall be refunded with 10% annual simple interest from the initial conduct." Are a special district's proceeds from the issuance of *1153 bonds "revenue"? Because TABOR doesn't define the term, we must lean on familiar principles of constitutional interpretation to answer that question.[15]
¶ 60 TABOR became part of Colorado's constitution through the citizen initiative process. Our aim in interpreting such an amendment is to "give effect to the electorate's intent." Colo. Ethics Watch v. Senate Majority Fund, LLC , 2012 CO 12, ¶ 20, 269 P.3d 1248 (quoting Davidson v. Sandstrom , 83 P.3d 648, 654 (Colo. 2004) ).
¶ 61 We start, of course, with the ordinary and popular meanings of the amendment's words. Id. ; Davidson , 83 P.3d at 654 ; see also City of Wheat Ridge v. Cerveny , 913 P.2d 1110, 1114 (Colo. 1996) ("[W]ords used in our Constitution must be given their 'natural and popular meaning usually understood by the people who adopted them.' " (quoting Urbish v. Lamm , 761 P.2d 756, 760 (Colo. 1988) ) ) (construing TABOR). And we do this considering the amendment as a whole, accounting for context and seeking an interpretation that harmonizes all its provisions. See Colo. Educ. Ass'n v. Rutt , 184 P.3d 65, 80 (Colo. 2008).
¶ 62 As a general matter, TABOR imposes limits on government spending, revenue gathering and accumulation, and indebtedness. With respect to revenue specifically, it "limits the amount of revenue state and local governments can retain from all (save, essentially, federal) sources at the end of a fiscal year." Barber v. Ritter , 196 P.3d 238, 247 (Colo. 2008) ; see Colo. Const. art. X, § 20 (7)(d). "If the government's revenue exceeds this limit, the excess must be refunded to the taxpayers, unless their approval to retain the money is sought and obtained." Barber , 196 P.3d at 247 ; see Colo. Const. art. X, § 20 (7). Clause (1) provides that citizens may sue to enforce this limitation, as well as to obtain redress, in the form of a refund, when the government collects, retains, or spends excess revenue illegally.
¶ 63 Defendants argue, relying on Barber , that "revenue" means only tax revenue. But Barber doesn't say that. The TABOR issues in that case were whether fees, surcharges, and special assessments collected by the state became, upon transfer to the general fund, taxes causing a "net tax revenue gain" or a "new tax" or "tax rate increase" subject to clause (4)(a)'s requirement of voter approval. Colo. Const. art. X, § 20 (4)(a). The court held, in essence, that clause (4)(a) applies only to taxes, and that because fees, surcharges, and special assessments aren't taxes, they don't become subject to clause (4)(a) when transferred to the general fund. Barber , 196 P.3d at 248-52. The court didn't construe the term "revenue" as used elsewhere in TABOR, but instead construed a provision of TABOR-clause (4)(a)-dealing expressly with taxes. We don't read Barber as saying, or implying, that only taxes are revenue for purposes of TABOR. To the contrary, in setting the table for addressing the issues before it, the court said that "fees constitute 'revenue' under [TABOR] accounting principles from the time they are collected." Id. at 248.
¶ 64 But this doesn't mean that all money received, regardless of source or circumstances of acquisition, constitutes revenue subject to clause (1). Looking at the plain and ordinary meaning of the term, we see that, when it comes to government entities, "revenue" means "the annual or periodical yield of taxes, excises, customs, duties, and other sources of income that a nation, state, or municipality collects and receives into the treasury for public use." Webster's Third New International Dictionary 1942 (2002); see also Black's Law Dictionary 1513 (10th ed. 2014) (defining "revenue" as "[t]he total current income of a government, however derived; esp., taxes"; and defining "general revenue" as "[t]he income stream from which a state or municipality pays its obligations unless a law calls for payment from a special fund"); see also TABOR Found. v. Reg'l Transp. Dist. , 2016 COA 102, ¶¶ 63-65, 417 P.3d 850 (a court may consider dictionary definitions in ascertaining the plain and ordinary meaning of an undefined term; using such definitions to construe "policy" in TABOR), aff'd , 2018 CO 29, 416 P.3d 101.
*1154 ¶ 65 The bond proceeds at issue don't fit within that meaning. They are borrowed funds, not income. Further, they aren't subject to "refund" to District property owners because they weren't collected from those property owners in the first place. Rather, they were lent to the District by a private, outside entity. We therefore conclude that District property owners, including the Landmark owners, aren't entitled to refunds of misappropriated bond proceeds under clause (1) of TABOR.
¶ 66 We also conclude that the Landmark owners aren't entitled to refunds under article XI, sections 1 and 2 of the constitution.[16] These sections "prohibit mingling of public funds with private funds." In re Interrogatories by Colo. State Senate (Senate Resolution No. 13) Concerning House Bill No. 1247 , 193 Colo. 298, 306, 566 P.2d 350, 356 (1977) ; accord Lord v. City & Cty. of Denver , 58 Colo. 1, 16, 143 P. 284, 288 (1914) ; see Lyman v. Town of Bow Mar , 188 Colo. 216, 222-23, 533 P.2d 1129, 1133 (1975) ("These sections basically prohibit lending, pledging credit or making donations to persons, companies or corporations by the state, counties, cities or towns of Colorado."). But both are limited in their application to the state, counties, cities, townships, and school districts. Colo. Const. art. XI, §§ 1, 2. The District is none of these; it's a special district that by law is a quasi-municipal corporation and political subdivision, solely responsible for its own debts. See §§ 32-1-103(20), - 1101, C.R.S. 2017; cf. N. Colo. Water Conservancy Dist. v. Witwer , 108 Colo. 307, 310, 116 P.2d 200, 201 (1941) (water conservancy district was a quasi-municipal corporation not subject to sections 1 and 2 ); Milheim v. Moffat Tunnel Improvement Dist. , 72 Colo. 268, 280, 211 P. 649, 654 (1922) (tunnel improvement district wasn't subject to article XI, section 8, which applied, before its 1969 repeal, only to cities and towns). So even assuming Davidson's misappropriation of bond proceeds is a kind of act otherwise prohibited by sections 1 and 2 (a conclusion that isn't at all clear), those sections don't afford relief to the Landmark owners because they don't apply to the District.[17]
¶ 67 We therefore conclude that the district court erred in ordering refunds of the money Davidson misappropriated.
III. Conclusion
¶ 68 We reverse that portion of the judgment ordering TABOR refunds of the $384,611 Davidson misappropriated. We affirm the remainder of the judgment. We remand the case to the district court for further proceedings consistent with this opinion.
JUDGE WEBB and JUDGE BERNARD concur.

At this point in time, numerous Landmark Project condominiums were under contract, but none of them had closed.

Other terms of the bonds also materially deviate from the Service Plan, to the detriment of District residents. The District didn't get city approval for those deviations.

Davidson committed suicide after he was indicted for fraud.

Defendants belittle Myles Salt by referring to it as "a 100-year-old decision." Be that as it may, defendants don't argue that it is no longer good law. And it should go without saying that we must follow Supreme Court precedent on matters of federal constitutional law. People v. Schaufele , 2014 CO 43, ¶ 33, 325 P.3d 1060.

Defendants also seem to say that the supreme court decided in Landmark II that the levy is a tax. It didn't. It referred to the levy as a tax, but it didn't address the issue of whether it is a tax.

The District comprises only fifteen acres. Greenwood Village comprises 8.3 square miles, about 5,321 acres. The District thus makes up less than 0.3 percent of the city. And as the district court found, infrastructure for the Landmark Project was separately financed and paid for. None of the European Village Project infrastructure was needed for the Landmark Project. "If property is not benefited by an improvement by reason of the existence of a like or similar improvement from which the property derives all the benefit of the kind necessary to its use and enjoyment, it is not subject to assessment for the later improvement." 14 Eugene McQuillin, The Law of Municipal Corporations § 38:42, at 220 (3d ed., rev. vol. 2008) ; see City & Cty. of Denver v. Greenspoon , 140 Colo. 402, 344 P.2d 679 (1959) (relying on this principle to declare an assessment void).

Defendants also argue the levy couldn't have been a special assessment because, when the District was created, special districts didn't have statutory authority to impose special assessments. But the fact the District wasn't authorized to impose special assessments doesn't mean it didn't do so. As discussed, the nature of the levy is determined by its purpose and characteristics. If the purpose and characteristics of a levy show that it's a special assessment, then that's what it is. In the end, even if defendants are right about the state of the law at the time of the election, that means only that there's another reason for declaring the special assessment invalid.

Defendants' entire argument on this point is that "the court misapplied the law, and thus also the equities." This assertion is so perfunctory that we'd be justified in disregarding it altogether. S. Colo. Orthopaedic Clinic Sports Med. & Arthritis Surgeons, P.C. v. Weinstein , 2014 COA 171, ¶ 35, 343 P.3d 1044.

At trial, Bondshares' representative agreed with Landmark's counsel's assertion that "absent some magical ability to collect [the balloon payment], [the District] would have no choice but to refinance."

This rule applies regardless of whether the uniform tax argument is an affirmative defense. And so we don't need to decide whether it is.

The district court's judgment already does this as a practical matter.

We've concluded that creation of the District to include the Landmark owners, and resulting assessments on their properties, violated their rights to due process under the United States Constitution. That federal constitutional violation trumps any possible incidental violation of the state constitution. In re Title, Ballot Title and Submission Clause for 2013-2014 #90 , 2014 CO 63, ¶ 58, 328 P.3d 155 (state law can't trump federal takings protections); Middleton v. Hartman , 45 P.3d 721, 731 (Colo. 2002) ("[T]he Supremacy Clause [of the United States Constitution] mandates that state law give way when it conflicts with federal law."); Mesa Verde Co. v. Montezuma Cty. Bd. of Equalization , 898 P.2d 1, 7-8 (Colo. 1995) (the Supremacy Clause precludes state taxation of federally owned land; article X doesn't apply to such land even though no such exemption is stated therein).

We observe that it's undisputed the bonds were issued as "limited tax" bonds, not unlimited tax bonds. This would seem to indicate that the fifty-mill-rate limit of section 32-1-1101(6)(b) and the Service Plan were intended to apply to the bonds.

Defendants take issue with the district court's characterization of the 59.5-mill-rate levy as a "TABOR" violation. But they don't argue that the court otherwise lacked authority to order a refund of illegally collected levies.

The interpretation of a constitutional provision presents a question of law that we review de novo. Gessler v. Colo. Common Cause , 2014 CO 44, ¶ 7, 327 P.3d 232.

Landmark made this claim in the district court, but the district court didn't rule on it. We may consider whether to affirm based on this claim because Landmark preserved it and we may affirm on any ground supported by the record. See Rush Creek Sols., Inc. v. Ute Mountain Ute Tribe , 107 P.3d 402, 406 (Colo. App. 2004).

Landmark also mentions sections 3 and 4 of article XI, which concern limitations on state debt, but hasn't ever explained how those provisions arguably apply to this case.